##### IN THE

## COURT FOR THE CORRECTION OF ERRORS

##### OF THE

## STATE OF NEW-YORK,

##### DURING THE YEAR 1832—EMBRACING A FEW CASES HEARD IN THE WINTER SESSION OF 1833.

---

## LIVINGSTON, *appellant*, and the PERU IRON COMPANY and others, *respondents.*

Where, to a bill in chancery filed by a *purchaser* of land, alleging a previous conveyance of part of the same premises executed by his grantor to have been obtained by fraud, and that the grantee, under such fraudulent deed, had entered into possession and held and occupied the premises, praying a discovery, an account and general relief, the defendant *demurred*, relying upon his possession under his deed as rendering void the conveyance to the complainant; *it was held*, that the possession under the deed admitted by the demurrer to have been fraudulently obtained, could not be considered *adverse* so as to avoid the deed *to* the complainant, and the demurrer was overruled and the defendant decreed to *answer.*

A deed *fraudulently obtained* is not available as the foundation of an *adverse possession*, so as to avoid a subsequent conveyance; nor is a deed available for such purpose executed by a person assuming to act as the attorney of the grantor, but without authority, when such want of authority is known to the grantee.

To constitute a *possession adverse* so as to bar *a recovery* or to *avoid a deed* subsequently executed by the true owner, the party setting up the possession must, in making his entry upon the land, act *bona fide;* he must rely on his title; he must believe the land to be his, and that he has title thereto, although his title may not be rightful or valid; but if the title be an absolute nullity, as a deed obtained by *fraud* or *forgery*, it will not serve as the foundation of an adverse possession.

APPEAL from chancery. The appellant, Anthony R. Livingston, filed his bill in chancery, in which, after stating that in 1811, his father, John Livingston, made an arrangement with him, two of his brothers, and his only sister, to convey to them in fee simple, in severalty, parcels of his real estate for their respective portions of the same, and that in pursuance of such arrangement, and for the purpose of carrying the same into effect, his father, on the 1st January, 1820, in consideration of *nataral love* and *affection* towards him, and of *one dollar* acknowledged to have been paid to him by the appellant, did grant and convey unto the appellant two lots of land in the county of *Clinton*, containing together about 9000 acres, one of the lots being known as lot number *one*, and the other as lot number *eight*, of a tract in the bill described—alleged that one Z. Palmer, having discovered a valuable iron ore-bed on lot number *eight*, applied, in the month of May, 1819, to John Livingston, the father of the appellant, for the purchase of 164 acres of land, embracing the ore-bed, representing the same as of little value, and of no use except for a sheep pasture, for which purpose he alleged he wanted it ; that his father wrote a *letter* to his agents, A. & G. Sperry, authorizing them to *contract* with Palmer for the sale of the 164 acres of land at two dollars per acre ; that on the 17th May, 1819, the Messrs. Sperry, assuming to be authorized by the said John Livingston, and as his attornies, executed in his name a deed in fee with full covenants, conveying the 164 acres to one *Curtis Murray,* who is charged in the bill with having been a party to the fraud practised by Palmer ; that the Messrs. Sperry had no power of attorney or authority to execute such conveyance, other than the *letter* above mentioned ; that *immediately* after the conveyance to Murray, he and Palmer commenced opening and digging the ore bed, and raised therefrom large quantities of very valuable iron ore ; that Murray sold out various portions of the ore bed ; that the respondents, who are now the owners of the same, have erected iron works in the vicinity, which are supplied with ore from the ore bed, which is stated to be worth $70,000, and the annual profits of which are alleged to be $10,000. The bill further alleges, that the respondents purchased with full

knowledge of the fraud committed by Palmer; that John Livingston, until his death in 1822, resided 200 miles from the ore bed, and during his life time never knew of its existence; that the appellant resides 200 miles from the ore bed, and that until 1825, he had no knowlenge of its existence; and concluded by asking a discovery, an account, and general relief.

The defendants put in a general demurrer to the bill, and assigned as causes of demurrer specially, that at the time of the conveyance to the complainant, Murray to whom the deed of the 164 acres was executed, was in possession of the premises under and by virtue of his deed; that the bill, instead of being filed by *all* the heirs at law of John Livingston, is filed by the complainant alone; and that such a case is not made out as entitles the complainant to discovery or relief. The cause was argued before the chancellor, who was of opinion that the deed to Murray was fraudulently obtained and might be avoided, but that Murray and those claiming under him being in the actual possession of the premises at the time of the conveyance to the complainant, claiming to hold under the deed executed by the Sperrys, must be considered as *holding adversely*, and that consequently the legal title to the property could not pass to the complainant by the conveyance from his father. The chancellor therefore made a decree allowing the demurrer, but gave leave to the complainant, on payment of costs, to amend his bill by making all the heirs at law or devisees of John Livingston parties thereto. From this decree the complainant appealed.

*Murray Hoffman & A. Van Vechten,* for the appellant. The deed to Murray having been fraudulently obtained, was not merely *voidable,* but absolutely *void.* 1 *Vernon,* 443. 2 *id.* 336. 1 *Vesey, sen.* 289. 14 *Vesey,* 234. 2 *Johns. Ch. R.* 512. 4 *Johns. R.* 598. *Roberts on Fraud. Conv.* 500. Being void, no right could accrue under it; a possession under it will not be considered *adverse,* so as to avoid a subsequent conveyance by the defrauded grantor. The protection afforded by law to a possession is intended as a shield to innocent purchasers, and not as a weapon of attack to a fraudulent possessor against the

rightful owner. A possession fraudulently taken is unavailable to the party. 6 *Wheaton*, 580. Nor was the deed to the complainant void under the statute to prevent champerty and maintenance ; it was a deed from a father to his son, in consideration of natural love and affection ; it was more in the nature of a devise than of a purchase, and therefore not within the mischief of the statute, 1 *Leon.* 167. 3 *Cowen*, 644. 5 *Johns. R.* 504. 2 *id.* 58. *Viner's Arb. tit. Maintenance, H. Brook's Arb. tit. Maintenance*, 73, 74. *Starkie's R.* 95. *Goldsborough*, 101. *And.* 201. *Brown*, 271. Besides, there is nothing to shew that the grantor or the complainant, at the time of the conveyance to him, knew of any adverse possession. 9 *Cowen*, 530, 557. 7 *Wendell*, 155. Again, the deed to Murray is void for the want of authority in the persons assuming to act as the attornies of John Livingston. A power to *contract* confers no power to *convey*. Authority to enter into a contract with A. for the sale of lands does not authorize a contract with B. Besides, a power to convey lands must be under seal. 4 *Cranch*, 403. 6 *Wheaton*, 119. 12 *Johns. R.* 73. 12 *id.* 355. 5 *id.* 239. Here the power was by parol.

*H. Bleecker*, for the respondents. At the time of the conveyance to the complainant, the lands were holden *adversely* under the deed to Murray, and consequently nothing passed to the complainant. A purchaser holds adverse to his grantor. 18 *Johns. R.* 362. An adverse possession may exist, although the title under which it is held be void ; and it is immaterial whether the party be in by force or fraud, if he claims the land as his own, the possession is adverse. A disseisin may grow out of a void or fraudulent deed. 9 *Johns. R.* 180. 18 *id.* 40. 8 *Cowen*, 590. 5 *Peters*, 439. *id.* 354. The deed to the complainant therefore was void ; for although the penalties of such conveyances are no longer imposed, the conveyances themselves are still forbidden. 1 *R. S.* 739, § 147. 2 *id.* 691. The *scienter* as to the adverse possession need not be shewn, except where the penalty is sought to be enforced. 1 *Wendell*, 433. 14 *Johns. R.* 124. 11 *id.* 569. 15 *Mass. R.* 113. The conveyance to the complainant was a deed, and not a devise, or in the nature of a devise ; it was a convey-

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

ance *in præsenti*, and it was for a valuable consideration alleged in the deed, which allegation cannot be contradicted. 1 *Johns. R.* 139. The agents of John Livingston had authority to make a contract for the sale of the land, although their power was not under seal, *Comyn's Dig. tit. Attorney, C. 5, C.* 13 : *Co. Lit.* 258 ; and having made the contract, and the consideration having been paid, and the purchaser having entered, the possession was adverse. A conveyance might have been compelled. 1 *Marshall's Kent. R.* 436. The bringing of this suit is an admission of authority in the agents to convey, or why file this bill ? If the Sperrys had not authority to convey, the remedy of the complainant is perfect at law. Allowing the deed to Murray to have been obtained by fraud, it is good until avoided in equity, and no one but the grantor himself, or his heirs or devisees, can avoid it ; a purchaser cannot shew fraud. 3 *Co.* 83. *Viner's Abr. tit. Fait. F. a. Bacon's Abr. tit. Void and Voidable.* 5 *Johns. Ch. R.* 555. 6 *id.* 235. The deed to Murray, however, was *voidable* only, and not absolutely *void*, and could be taken advantage of only by the grantor or his heirs, by pleading the facts relied on to shew it void. Under the plea of *non est factum*, the fraud could not be given in evidence. *Viner's Abr. tit. Void and Voidable.* A covenant cannot be avoided in a court of law, on the ground of misrepresentation as to the consideration. 5 *Cowen*, 509. A fraud which avoids a specialty at law must relate to the execution of the instrument, as if a deed be fraudulently misread, or where there is a fraudulent substitution of one deed for another, and the party's signature is obtained to a deed which he did not intend to execute. 8 *Cowen*, 293, 2 *Johns. R.* 177. Fraud as to the consideration cannot be set up to avoid an agreement under seal ; but fraud as to the execution may. 5 *Cowen*, 506. The court, in delivering their opinion in the case last cited, say, the fraud which avoids a deed is not a fraudulent representation as to the consideration, but a fraud relating to the execution of it, as a fraudulent misreading, or obtaining such an instrument as the obligor did not intend to give. Fraud may be given in evidence under *non est factum* only, where it relates to the execution of the instrument. 13 *Johns. R.* 430. A specialty (e. g. a lease under seal) cannot

be impeached at law on the ground of fraud or misrepresentation as to its consideration or the motives of its execution. 8 *Cowen,* 290.

The following opinions were delivered :

By Chief Justice SAVAGE. The chancellor decided that the fraud in obtaining the deed was sufficient to avoid it, but that the complainant was not in a situation to take advantage of it, as his own deed was void, it being executed when Murray and Palmer were in possession, holding adversely. The latter point in the decision of the chancellor presents the only question now before the court.

I consider the principle too well settled, to admit at this day of an argument, that a deed executed by the true owner, while there is a person in possession of the premises, holding adversely, is void as against such possessor, although it is good as against the grantor and his heirs. Both these points are decided in the case of *Jackson* v. *Dumont,* 9 *Johns. R.* 55. The important inquiry in the case therefore is whether Murray and Palmer were, (within the rule of law,) holding adversely on the first of January, 1820, when John Livingston conveyed the premises to the appellant ? The doctrine of adverse possession has been so much and so often discussed in our courts that it ought at this day to be well understood. To *prevent a recovery* by the true owner, there must be a *possession* in the defendant, *adverse* in its character, and must have continued for twenty years. To *render a conveyance* by the true owner *void* as to tho person claiming by possession, there must also be a *possession,* and that possession must be *adverse* in its character, and it must exist at the time of the execution of such conveyance, but no particular length of possession is necessary to make it effectual for this purpose. The acts which constitute a possession are different according to the evidence of claim. Where the person claiming to hold by possession has no written evidence of title, but claims by *parol* to be the owner, there must be an actual occupancy; a *pedis possessio,* a substantial enclosure by fence, sufficient for the protection of the crops. It must be marked by definite boundaries. *Brandt* v. *Ogden,* 1 *Johns. R.* 158. A possess-

sion fence by felling and lapping trees is too loose and equiv- ALBANY,
Dec. 1832.
ocal. "There must be a real and substantial enclosure, an
actual occupancy, a *pedis possessio* which is definite, positive Livingston
and notorious, to constitute an adverse possession, when that v.
Peru Iron Co.
is the only defence, and is to countervail a legal title." *Jack-
son* v. *Schoonmaker*, 2 *Johns. R.* 234. An adverse possession
to avoid a deed must be made out clearly and positively, and
not by inference. 8 *Johns. R.* 220. 9 *id.* 167, 8. Actual
occupancy under claim of title, whether by deed or not, is
good to the extent of such occupancy. But when a lot is
claimed to be held adversely, and part of it only is improved,
it must be under a paper title ; and such paper title must de-
scribe the premises claimed, part of which is under actual oc-
cupancy. 1 *Cowen*, 285, 6. Without the paper title the pos-
session is limited by the *pedis possessio.* It is immaterial
whether the deed conveys a good title ; reliance on possess-
ion after title shewn in the plaintiff presupposes want of a
legal title in the grantor ; but if no lands are described in it
nothing can pass, the deed is a nullity, and lays no founda-
tion for a claim beyond the actual occupancy. *Id.* It would
be easy to multiply cases to the same effect, that an adverse
possession without paper title is good only to the extent of
actual enclosure, and no further.

What acts are sufficient to constitute the *character* of the
possession adverse ? If a person enters upon land and culti-
vates it, and lives on it, and says he is the owner, that is suffi-
cient to make his possession adverse. He claims to be the ow-
ner in opposition to all the world. If he claims it, and gives as
a reason why it belongs to him, that he has first taken possess-
ion, and no other person has produced a title for it, though he
has nothing but possession, such possession is not adverse.
*Jackson* v. *Frost*, 5 *Cowen*, 346. So if the first occupant sell
merely his *possession*, not assuming to convey the title, such
conveyance cannot be the basis of an adverse possession, be-
cause it supposes a better title in some other person. The
claim must be of the entire title. It is not necessary that the
title set up should be a rightful title. When the plaintiff has
shewn title, and the defendant relies on possession, the idea of
right is excluded ; the fact of possession and the *quo animo* it

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

was commenced or continued are the only tests; and it must necessarily be exclusive of any other rights. 9 *Johns. R.* 180. This doctrine has been often repeated. Let me ask what is meant by the *quo animo?* Is it an intent to take possession of another man's land, knowing it to be so, and to make it his own by 20 years possession? That will not be pretended. Such an entry would be a mere trespass, and the person so trespassing, with no other pretence or color of title, will always be a trespasser. The *animo* then, or intent with which an entry is made, must be *bona fide* an entry believing in good faith that the land is his and that he has title. To prove this proposition I refer to the opinions of the members of this court, delivered in the case of *La Frombois* v *.Jackson,* 8 *Cowen,* 595, *et sequitur.* That case has sometimes been considered as overturning some of the doctrines of the supreme court on the subject of adverse possession, and therefore I choose to take the law from it. Chancellor Jones, speaking of the possession of La Frombois, says : "The *quo animo* is apparent, from his uniform claim of title, and continued exercise of acts of ownership. His entire confidence in his title, and his reliance upon its sufficiency to protect his possession, and the assertion of his rights under it against the claims of the proprietors under the patent, are decisive of his own opinion and belief in the validity of his title." According to Chancellor Jones, the defendant must have such a title as he relies on, and believes is a good one ; whether it, in point of fact, is good or not, is not the test, but whether he believes it to be good. He must rely upon it, and it would seem must have some reasons for such reliance, for the learned chancellor goes into an argument to shew that he had good reason so to rely in that case. The court below in that case had said that La Frambois' title was from a foreign government, and therefore presumed to be known to him as insufficient to constitute the basis of an adverse possession. The chancellor goes on to shew that no such fact appeared in the special verdict ; that the court below had mistaken the fact. Their law is not denied. The case of *Jackson* v. *Waters,* 12 *Johns. R.* 365, is commented on by the chancellor, and its correctness is not denied. In that case the fact did appear that La Frombois claimed under Mackay, *who derived title under the French government.* In the case

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

of *La Frombois* v. *Jackson*, the claim was for a different lot from that which was the subject of the suit in *Jackson* v. *Waters*, but it was supported by the same writing from Mackay. Whether the further fact appeared upon the case in the court below, from which the special verdict was framed, or whether the court below had actually mistaken the fact, from the circumstance that the same paper was produced as evidence in both cases, does not appear, nor is it material to enquire. It is sufficient for my purpose that it is not denied that a deed from a foreign government cannot constitute a possession under it adverse. It had been so decided in *Jackson* v. *Waters*, and Chief Justice Thompson gives the reason, because such a grant is absolutely void, affords no legal evidence of title, and possession taken under it is unavailing for any purpose. Now is it possible that La Frombois might rely upon it, though it was a perfect nullity; yet the court say that the title must be such as by possibility might convey a right, and he must have been presumed to know that his title was a nullity. This principle is not denied by Chancellor Jones. It is admitted by him, *arguendo.* He says : "Whatever the right of Mackay was, if La Frombois went into possession *supposing it to emanate from a legitimate source,* and in confidence that his contract entitled him to a conveyance, and that Mackay had the right to give the conveyance he promised, his possession would be adverse, notwithstanding his confidence was misplaced, and the title of Mackay, under whom he entered, was invalid." The chancellor proceeds to argue that Mackay supposed his claim was under the English government, which, before the revolution, would be good; and strenuously insists that it was not under the French government. Colden, senator, recognizes the case of *Jackson* v. *Waters* as sound law, and assumes, that "when a possession is held under a claim of title *which is not shewn to be bad, and which might be good,* it shall, after a sufficient lapse of time, bar every other title." The doctrine in the case of *Jackson* v. *Waters,* is admitted by all except senators Viele and Stebbins, and all admit that the person entering under the title must rely upon that title. Senator Stebbins intimates that a French grant is as good as any title to support on adverse possession.

The doctrine in *Jackson* v. *Waters* is distinctly this, that a possession taken under a grant from a foreign government is not such an adverse possession as will defeat the operation of a subsequent grant of the same land under our own government or the provincial government of New York. I have already remarked that this doctrine is not impugned by the case of *La Frombois* v. *Jackson*. In the latter case, the only point decided was that the person in possession under a written contract for more than twenty years, asserting title, was entitled to protection in his possession against a person shewing the true legal title; that point had never been denied. Indeed the law of that very case as laid down by the court below was not denied. The judgment was reversed because the court below had assumed a fact which did not appear in the special verdict, to wit, that La Frombois claimed to hold under a foreign government. That fact did not appear in this court; all the discussion, therefore, about the validity of such a claim was out of the case. What was said is entitled to great respect, on account of the learning and talents of those who discussed the subject; and the result of their opinions, I understand, with the exceptions above mentioned, to be, that such a source of title would *not lay the foundation of an adverse possession.*

Senator Spencer quotes with approbation what was said by Woodworth, justice, in *Jackson* v. *Woodruff*, 1 *Cowen*, 286, as follows: "If the title is bad, it is of no moment; but if no lands are described, nothing can pass. *The deed is a nullity, and can never lay the foundation of a good adverse possession,* beyond the actual improvement." Here is an express assertion that a deed which is a nullity can never lay the foundation of an adverse possession; that is precisely the principle of the case of *Jackson* v. *Waters*, and I consider it a sound principle which has several times been asserted by the supreme court, and has never been overruled by this court, and I trust never will be. In the arguments of the learned judges who delivered opinions in the case of *La Frombois* v. *Jackson*, much stress is laid upon the point, that every possession has, *prima facie*, the presumption of right in its favor, and authorities are cited to sustain it. There is no doubt that the principle is correct;

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

but the presumption exists only until the true title is shown; when that is done, the law presumes the possession to be in subservience to the true title. Whenever, therefore, an action is brought to recover possession of land, the presumption in the first place is in favor of the defendants' possession. The plaintiff must shew title; when he has done so, the presumption of law, which before was in favor of the defendant, now changes sides and is in favor of the plaintiff, because he has shewn in himself title, and the law attaches the possession to the title. At first, title was presumed to be with the possession; when title is shewn to be elsewhere, then the presumption is, that that possession was taken in subordination to the title. The defendant must after that shew the adverse character of his possession; if he cannot shew a title in himself, then it must be shewn affirmatively and positively, and the burden of the proof is thrown upon the defendant. I have adverted to these cases on the doctrine of adverse possession, with the view of ascertaining whether the case now under consideration falls within either of the classes of cases in which possession has been adjudged to be adverse. The facts charged in the bill are, that immediately after the deed executed by the Sperrys, Murray and Palmer commenced opening and digging the ore-bed, and raised therefrom large quantities of very valuable iron ore. Was this an adverse possession within any of the acknowledged principles on that subject? There was no improvement, no clearing, no fence of any description, no building erected, no actual occupancy; all the acts of ownership were digging ore. There was therefore nothing like an adverse possession, independent of the deed executed by the Sperrys; and from the principles above referred to, and well settled, if that deed was a nullity, there was no adverse possession—certainly none beyond the spot where the ore was dug. And if without the deed there was no adverse possession, and if the deed be a nullity, it is no more than blank paper; it would follow that there has been in contemplation of the law no possession to avoid the deed from John Livingston to the appellant.

The bill charges that by fraudulent representations, Palmer obtained a letter from J. Livingston to the Sperrys, directing

them to contract with him ; and that the Sperrys without any letter of attorney or authority whatever, other than the letter brought to them by Palmer, executed a deed under seal, with full covenants, not to Palmer but to Murray.   The letter was a special authority, and must be strictly pursued : it authorized a contract with Palmer, but not with any other person ; much less did it authorize a deed under seal.   A deed under seal cannot be execcuted by attorney without an authority under seal.   The deed executed by the Sperrys, professing to act as the attornies of J. Livingston, was not obligatory upon him ; as to him, I apprehend, it was void.   It is said that a deed which is *voidable* only, must be avoided by special pleading ; but when it is absolutely *void*, the plea is *non est factum.* If John Livingston were living, and an action were brought upon the deed in question, it would certainly be sufficient to plead the general issue ; and upon the trial it must be shewn that the person professing to act as attorney, had authority by deed.   According to the facts in this case, as charged in the bill and admitted by the demurrer, no such authority could be shown ; of course, the deed is not the deed of John Livingston.   The entry of Murray and Palmer was therefore without a deed ; they are in no better situation as to adverse possession than if they had no deed, and in that case, I have endeavored to show that the possession could not be adverse.   It is true, that to sustain an adverse possession, it is not necessary that a deed should be a valid deed, but it must be such an one as might be valid, and which the grantee relies on. The grantee in this case being privy to the manner in which this deed was obtained without authority, knew, for he was bound to know, as ignorance excuses no man, that the deed was inoperative and void.   But the defendants, Murray and Palmer, not only knew that the deed was without authority, but they also knew that the authority which was given to contract the lot to Palmer was also void, as having been obtained by fraud.   The letter in terms authorized a contract with *Palmer ;* and instead of this an absolute deed is given to *Murray,* not even pursuing the authority of the letter.   It seems to me, therefore, that the deed was a nullity, and that the defendants, Murray and Palmer, knew it to be so.   It was

therefore no foundation for an adverse possession. It did not divest the nominal grantor of any interest whatever ; it vested no estate in the nominal grantee ; he was a trespasser. The case of *Bradstreet* v. *Huntington*, has been cited to prove that an adverse possession may commence under a void deed, or one obtained by fraud. At common law, a feoffment could not be made without livery of seisin, or a delivery of the possession ; and where the owner was disseized of the possession, he could not convey to a third person, because he could not deliver possession, that being held by the disseizor ; and yet it is settled law that such a deed is good between the parties to it ; it is good as against the grantor and his heirs, it conveys all the interest of the grantor to the grantee, but the grantee cannot enforce it in his own name against the disseizor, though it may be done in the name of the grantor. It has been supposed in the above case that an *adverse possession* should more properly have been called an *ouster* or *disseisin*. Though they are sometimes synonimous, they are not always so. A disseisin, it is said, may commence by force or fraud ; an adverse possession may commence by force, but, I apprehend, not by fraud, as for instance, under a deed obtained by fraud or by forgery. The person guilty of the fraud or forgery cannot rely upon such a deed as conveying a valid title ; and the arguments which have gone the greatest length in favor of adverse possession, have proceeded on the ground that the possessor relied on his title, and believed the property which he possessed to be his own. A man may think himself the true owner of property in the possession of another, and may take forcible possession under claim of title ; that is an adverse possession ; but if, with a full knowledge that such property belongs to another, a person procures a forged deed, and enters under that, what is the *quo animo ?* Is it an intent to enjoy his own, or to defraud another ? And it has been often said and decided that the fact of possession and the *quo animo* the possession was taken, are the only tests. If the *quo animo* is a *bona fide* intention to enjoy his own property, that intent can never exist where the possessor knows the property is not his own. If the *quo animo* is meant an intention to appropriate the property to his own use, right or wrong, then indeed is the possession of almost all intruders adverse.

My conclusion is, that the entry of Murray and Palmer in 1819 was not such an adverse possession as avoids a deed executed by the owner to a third person. It may be said that if the deed is void, then the remedy at law is complete, and a resort to a court of equity unnecessary. It is a sufficient answer here that the point was not raised nor discussed in the court below, and the bill seeks a discovery. If the complainant is entitled to relief, he is also entitled to the discovery. The deed to Murray is void, so as not to lay the foundation of an adverse possession, assuming as facts positions which are to be established by the oath of the defendants, and possibly in no other manner. I am of opinion that the decree of the court below be reversed, that the demurrer be overruled, and that the defendants be required to answer the bill.

Justices SUTHERLAND and NELSON concurred in the opinion delivered by the chief justice.

By Mr. Senator ALLEN. It appears to be admitted by the appellant, in his bill of complaint, that Murray and Palmer not only contracted with the agents of John Livingston for the land in question, but that they obtained a conveyance in fee of the same, executed by the said agents in the name and on behalf of their principal, with full covenants ; also, that they went into possession of the premises, and commenced working the ore bed, and for aught that appears in the case, are still in possession by themselves or by those who hold under them. The bill charges, however, that Palmer having discovered a valuable bed of iron ore on the land, falsely represented it to be of little value, and of no use except for a sheep pasture, for which purpose he wanted it, and fraudulently concealed the existence of the iron ore bed. There being no answer to this bill, we are to consider the averments as true, or at least admitted by the respondents to be so ; and were the case now to be decided on its merits solely, with no further evidence than what appears from the bill, my opinion might be different from what it is. There certainly was a gross misrepresentation by Palmer as to the value of this land, and the purposes to which it was to be applied. On

the other hand, however, it would seem proper that the agents of Livingston ought to have known the properties and value of the land, with the sale of which they were entrusted, and to have informed him accordingly. In all large tracts of land, there naturally will be a considerable diversity of soil and situation, and consequently a corresponding difference in value. If agents, therefore, know nothing of the situation of land generally, the sale of which is entrusted to them, they must be liable to much imposition from interested purchasers; and if they do know, and omit to inform their principal, in cases like the present, the injury resulting ought not to be chargeable to the purchaser. There can be no law, as I apprehend, that would compel a purchaser to communicate to the vendor the knowledge he may have obtained by a personal examination or otherwise of the premises he was about purchasing, especially if such communication would be the means of enhancing the price. Every man having property to dispose of, is bound to know its value; and if ignorant of it, it is his misfortune, and he ought to abide the consequence; at the same time, no man is authorized to deceive another by false representations, in order to obtain a thing for much less than its real value, and thus appropriate to himself the property of another by a fraudulent representation of its uses and value. If the facts however are as they appear to be admitted, that Murray and Palmer were put into possession of the land under a conveyance in fee with full covenants by the agents of John Livingston, and were in possession at the time that he executed the deed to the appellant, is not such possession adverse?

The deed under which the appellant claims was dated on the 1st of January, 1820, about eight months after the sale to Murray and Palmer, and no attempt has been made, by any thing which appears in the case, to dispute their title until the filing of the present bill, which took place on the 18th of October, 1829, nearly ten years after the date of the deed to the appellant. The principle has been well established by numerous cases, that the conveyance of land by a person out of possession, such land being held adversely by another, annuls the deed; and the person receiving such convey-

ance cannot maintain an action upon it, or obtain the right to enter on the possession of such land. No transfer of real estate can be good, if the grantor has not the ability to deliver the possession of it, as possession has ever been necessary, in order to acquire and ascertain the property in land; and without it, a man cannot be considered the complete owner, so as to transmit the inheritance to his heirs. 5 *Johns. R.* 489. 9 *id.* 55. 3 *Johns. Cas.* 101. 2 *Caines*, 183. 2 *Black. Comm.* 312. The eight section of the act of the legislature to prevent champerty prohibits the buying or selling of pretended titles to land by any person, unless he, or those by whom he claims, shall have been in possession of such land, or have received the rents and profits of the same for the space of one whole year next before such sale or conveyance, under the pain of forfeiting the whole value of such land, both by the buyer and seller. 1 *R. L.* 173. The policy of this law is salutary, and is intended to guard the public from imposition, by having pretended titles to land palmed upon them as genuine, and to prevent unprincipled speculators from preying upon the credulity of the unsuspecting portion of the community, by selling that which has no existence other than the description of the thing set forth in the fraudulent conveyance of the vendor. By this act a heavy penalty is recoverable both from the buyer and seller of pretended titles; but if a person conveys land without knowledge of an adverse possession at the time of such conveyance, he shall not be liable to the penalty, though in all cases it is to be presumed in the first instance that the seller of land knows the situation of it. 1 *Wendell*, 437. The conveyance under which the appellant claims, therefore, must be considered within the penal provisions of the act of the legislature, unless it can be shewn that neither the grantor or grantee knew of the existence of the title held by the respondents, and under which they were in possession of the land. Whether they had any knowledge of this adverse possession or not, does not appear; but of this there can be no doubt that instead of the grantor having been in possession of the land in question, or of his taking the rents and profits thereof for the space of one whole year next before the execution of the deed to the appellant, as specified in the

statute, he was out of possession for nearly eight months previous to that transaction. The facts in the case, therefore, are in direct opposition to the provisions of the statute.

It was insisted by the counsel for the appellant, that inasmuch as the title of the respondents was obtained by misrepresentation and fraud, it is void, and therefore that the possession of the premises under this fraudulent title could not be adverse to a conveyance by the defrauded grantor. It has been decided, however, and the decision is in accordance with the provisions of the statute, that it is not necessary, in order to constitute an adverse possession, that it should be held under a good or rightful title. The fact of possession, and that it was commenced and continued, are the only tests, and it must be exclusive of all other rights. 18 *Johns. R.* 40. 9 *id.* 180. It seems, therefore, that by the provisions of the common law, and in accordance with those of the statute, no conveyance of real estate can be valid and effectual while such estate is held by a third person adversely.

The property in question being part of a large tract of land, containing between eight and nine thousand acres, was conveyed to the appellant by his father, John Livingston, on the 1st day of January, 1820. This grant was not properly a sale of the land, although in law it may be so considered, but a gift in consideration of natural love and affection, and was consummated in conformity with an arrangement previously contemplated for the division of the estate of the grantor among his children. Now as it is alleged that the adverse possession of the respondent is under a title from John Livingston by his attorneys or agents, and the claim of the appellant to the land thus held is by a conveyance executed by John Livingston also, and as the land cannot pass by the last conveyance unless the former shall be avoided, the question now is, was the bill properly filed, or can a suit be sustained by Anthony R. Livingston alone, without joining the other heirs at law of John Livingston? The law as laid down, 2 *Coke*, 83, is, that an estate made by fraud must be avoided only by him who had a former right, title, interest, debt or demand. A sale in open market by fraud shall not bar a right which is more ancient, and a fraudulent gift shall not

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

defeat an execution in respect to a former debt. In accordance with this authority; no person, except him who held title to an estate before the fraud was perpetrated, can avoid a fraudulent deed for such estate. As the deed to Anthony R. Livingston, therefore, was void by the adverse possession of the respondents, no title passed to him by the conveyance; and as he possessed no title to the one hundred and sixty four acres of land in question, it remains a part of the estate of which his father died seized, and consequently belongs to his heirs at law. If this position is corrrect, it follows that the heirs at law of John Livingston must be made parties to any suit which may be brought on this subject. It appears to me, however, that the bill ought to be dismissed, and the parties left to their remedies at law; for I hold it a sound rule that where relief can be obtained in a court of law, parties ought not to be encouraged to come into a court of equity. I will vote however for an affirmance of the decree of the chancellor, if that be deemed by the court the most advisable course.

By Mr. Senator SEWARD. Much of the difficulty in this case arises from the controversy between the parties as to the facts before the court. The chancellor, in assigning the reasons for his decree, says that the deed from John Livingston to the complainant is void because it appears by the bill that Curtis Murray and Zephaniah Palmer were in actual adverse possession of the premises in question at the time of the execution of that deed, under a deed from John Livingston to Murray, executed by his agents, A. J. and G. Sperry. The counsel for the appellant deny not only the correctness of the chancellor's opinion in point of law, but also the facts upon which it is grounded. The case is important on account not only of the principles involved in it, but of the magnitude of the subject of controversy; and as it is not probable that the decision of the question now presented to the court will terminate the controversy, it seems to be due to both parties that the state of facts, as understood by the court, should be explicitly declared.

Are we authorized to assume from the pleadings that Murray and Palmer were in possession of the premises in question

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

at the time of the execution of the deed by John Livingston to the appellant? Concerning this point, the bill informs us that Palmer, having discovered that there was a valuable bed of iron ore on a piece of land comprehended in lot No. 3, (which piece of land is described by metes and bounds, and as containing 164 acres,) applied to John Livingston for the purchase of the 164 acres. The bill states the negotiation, the writing of the letter, the execution of the deed by the Sperrys in the name of John Livingston to Murray, and then proceeds to state that immediately after Murray obtained the conveyance from the Messrs Sperry, he, together with Palmer, commenced opening the ore bed and digging in the same, and raised therefrom large quantities of very valuable iron ore; that Murray conveyed different portions of his interest in the 164 acres to sundry persons, all of whom are made defendants; that the ore bed is worth about $70,-000, and appears to be inexhaustible; that the defendants have erected iron works in the vicinity of the ore bed, which are in constant operation and are plentifully supplied with ore from the bed; and that the annual profits arising from the ore bed amount to at least $10,000. The bill prays that an account may be taken of the annual value and product of the ore bed during the times the several purchasers have respectively claimed an interest therein and worked the same. The equity of the bill plainly is, that the conveyance by John Livingston to Murray, and the subsequent conveyances from and through Murray, were obtained by fraud, and consequently should be set aside, and the defendants should account for the fruits of their fraud. These are the only parts of the bill relating to the possession of the premises, except the allegation that they are 200 miles distant from John Livingston's residence, and are stated to be in a wild, uninhabited and uncultivated region. Now it must be admitted that there is no distinct averment that Murray and Palmer were in possession previous to or at the time of the execution of the deed by John Livingston to the appellant; but, in my judgment, such an averment could not have rendered the fact more certain than it is made by inference, natural and irresistible from the facts and scope of the

bill. The operations of excavation, digging and removing ore from an ore bed, seem to imply the possession of the ore bed while those operations are performed ; and the continuance of those operations upon the scale and during the period described in the bill, taken in connection with the prayer for an account of the profits, can leave no doubt that *at some time* after the execution of the deed to Murray, the defendants or some of them became and continued absolutely possessed of the premises. At what time, then, did this possession commence ? The bill states that *immediately after obtaining the deed,* Murray and Palmer commenced opening and digging in the ore bed, and removed large quantities of iron ore ; and as no more distinct allegation is contained in the bill as to the time when possession was taken, we are compelled to understand that the possession commenced immediately. It was contended on the argument that, admitting the fact of the possession of the ore bed to be established, there is no ground to assume the fact of possession of the whole 164 acres ; and inasmuch as possession, when relied upon as a defence, must be defined and be proved co-extensive with the claim of title, the 164 acres cannot be said to have been in possession by reason of the possession of the ore bed. A careful reading of the bill, however, warrants the belief that the ore bed, if not co-extensive with the 164 acres, is the principal and indeed only ground of controversy. If there be any part of the 164 acres not occupied by the ore bed, it is not alleged to be fit for any other purpose than a sheep pasture ; no fraud in relation to it is alleged, and no relief concerning it is prayed.

Having thus arrived at the conclusion that the defendants were in possession at the time of the execution of the deed by John Livingston to the appellant, the next question is whether that possession was held under such circumstances as to invalidate the last mentioned deed. Possession available for that purpose must be exclusive of any other right ; it must be adverse to the right of him against whom it is set up. The possession in the present case was manifestly of that kind. The very fraud practiced to obtain the deed, the taking an absolute deed from the Sperrys assuming to grant all the right and title of John Livingston, and the immediate possession

and operations under the deed obtained, shew that the *quo* *animo* of the possession was adverse to and exclusive of John Livingston's rights. Another requisite to render such pos- session available is, that it must be *under color of title*. A deed need not be produced as the evidence of the founda- tion of the claim of title, but there must be some evidence of a deed or contract executed. Whether such contract was executed by the true owner or not is immaterial, and whether it were valid or voidable is not material. In this case, the entry was made claiming title under a deed, which deed, if it be held to be the deed of John Livingston, was the ground of a claim of title adverse to him and all the world. But it is contended that the deed was inoperative because it was absolutely null and void, and being so, could not be the ground to sustain a claim of title ; and two reasons are as- signed why the deed was void: the *first* of which is, that it was executed by the Sperrys without authority. If this po- sition were true, it would be difficult to discover on what grounds the bill in this cause proceeds ; the consequence is inevitable that the defendants are trespassers, they are lia- ble to an action of ejectment for the premises, and to ac- count at law for the mesne profits, and not to account in chancery as *trustees*, in which character it is evidently the object of the bill to bring them before the court. If the po- sition be true, it follows that the bill must be dismissed for want of equity ; and the chancellor erred in sustaining the bill to set aside conveyances on the ground of fraud, when in fact, although the fraud was perpetrated, it failed of its object— that of procuring a conveyance. But I agree with the chan- cellor and the appellant, that the fraud in this case has not been so harmless. The deed to Murray was executed by the Sperrys ; and who were the Sperrys ? The bill informs us they were the agents of John Livingston. Agents for what purpose ? Manifestly for the sale of this land. But it is said that those *agents* exceeded their authority. What was their authority ? It is stated to be, to " contract with Zepha- niah Palmer for the sale of the 164 acres of land at $2 per acre." It is said they transcended their powers, first in exe- cuting a deed instead of a contract, and secondly in executing the deed to Murray, when, by the letter of Livingston, they

were authorized to contract with Palmer.   The first objection seems to me to be merely an ingenious criticism.   Instructions to an agent in general terms to *contract* for the sale of land, authorize the agent, in his discretion, to sell the land absolutely, or by a contract to be executed at a future day.   The word *contract*, in relation to a sale of land, has in this country acquired a technical meaning, as contradistinguished from a deed; but when used as a verb, as it was in the letter of Livingston, I do not think it is to be construed in this technical sense.   If, instead of a deed with full covenants, the Sperrys had executed a quit claim deed merely, I think it would not be contended they had exceeded their powers.   I admit they exceeded their powers in executing covenants ; those covenants are worthless as against Livingston, but it by no means follows that this departure from or excess of authority vitiates the grant.   So far as they did act within their instructions, their acts were binding on their principal.   But it is said the agents departed from their authority in selling to *Murray* instead of *Palmer*, and that having no authority whatever to sell to Murray, their deed is void.   This objection would be well taken, did not the bill, as if from abundant caution, state all the circumstances necessary to justify the agents and sustain the deed.   The bill charges that Palmer and Murray were, before and after, and at the time of the negotiation, jointly and equally interested in the purchase.  Joint purchasers may direct the deed to be executed to either.   Palmer doubtless had a right to consent that the deed should be executed to Murray, and whether the deed was executed to one or both was immaterial to Livingston, except as concerned his security for the purchase money, on which ground Livingston could probably have avoided the deed ; but as no pretence of nonpayment is made in the bill, there is no ground here for avoiding the deed; and if there were, the deed would be voidable only, and not void, as is contended.   But it is insisted that this letter of John Livingston, being a mere parol authority, was not sufficient to warrant the execution of a deed which would be binding upon John Livingston ; that to authorise a deed, the power to execute must be under seal.   I grant that this deed could not be read in evidence in an action of ejectment, without proof of a more solemn nature than a parol dec-

laration or letter, of the power of the agent. But that principle has no application here. The question in adverse possession is not whether the deed under which the claim of title is made is valid or was executed with all necessary formality, but whether there was a deed or contract executed ; and this is a collateral fact, necessary to be proved, not for the purpose of establishing the deed or contract, but to shew the *quo animo* with which the possession was commenced and continued. Now if it would not be necessary to produce the deed or contract itself, but it would be sufficient to prove by parol that there was a deed, I submit that in this case the proof of a deed is stronger than the defendants would be compelled to make. The execution of the deed and the power to execute are stated in the bill. Thus I have arrived at the conclusion that the defendants were, at the time of the execution of the deed by John Livingston to the appellant, in actual adverse possession of the premises in question, claiming title under the deed to Murray. I come now to the remaining question, whether the deed executed by John Livingston to Murray was rendered absolutely *void* or *voidable* by the fraud practised upon John Livingston. If *voidable* only, it was sufficient to sustain the adverse possession ; if *void absolutely*, it was inoperative as well for that as all other purposes.

If it were to be admitted that fraud in procuring the execution of a deed renders it absolutely void, no human possession could be more insecure than that of real estate. It is a principle of law that nothing can set up or make good for any purpose, or for any person, that which being absolutely void, is as if it were not. What then would be the security of even bona fide purchasers under a fraudulent grantee ? The policy of the law is well settled that bona fide purchasers under a fraudulent grantee shall be protected. This could not be so if the deed to such grantee should be held absolutely void. Again ; could John Livingston at his election have affirmed the deed to Murray, and been concluded by such affirmance ; and would such affirmance have established the defendant's title ? Who will deny that he could have done so, and that such would have been the consequences of his affirmance ? And yet no such affirmance could set up a deed that was absolutely void ; make that a deed which never was a deed. The dis-

tinction between deeds void and voidable in this : a deed *prima facie* good is voidable only, that is, it is voidable only when by pleading, the facts must be shown which prove it void. Now the plea to set aside this deed must admit its execution and aver the fraud. *Vin. Abr. tit. Void and Voidable.* On *non est factum* pleaded the fraud could not be given in evidence. The result of this view of the subject is that the deed from John Livingston to the complainant is merely voidable, and not void, and that the possession of Murray and Palmer was adverse, so as to render inoperative the deed from John Livingston to the appellant.

A point was made on the argument that the deed from John Livingston to the appellent was not within the statute against champerty and maintenance ; and this was urged upon two grounds : 1. That the deed was to be regarded in the light of a devise ; and 2. That the near relationship existing between John Livingston and the appellant, (that of father and son,) excepted the grant from the operation of the statute against champerty and maintenance. As to the first ground, the deed was in the nature of a purchase, and not of a devise. It has all the requisites of a grant upon purchase, and none of the characteristics of a devise. It was to take effect immediately upon delivery, and was not postponed to the death of the grantor. The utmost that can be contended for, on this ground is, that John Livingston preferred to convey, and the appellant to take, in this manner, rather than by devise ; and having elected this mode of alienation, whether it contravene or carry out the intentions of the grantor, the conveyance is subject to all the rules and provisions of law applicable to this mode of alienation. It cannot be a deed for one purpose and a devise for another. But the other ground presents a question of greater difficulty. The facts are presented by the bill, that as early as 1811, John Livingston made an arrangement with his son the appellant, two of his other sons, and his only daughter, to convey to them in fee simple separate parcels of his real estate for their respective portions of the said real estate ; in pursuance of which, in 1811 he caused a division of said real estate to be made, and about the first of January, 1820, carried into effect the previous arrangement by executing to the appellant a deed for the portion so set off

to him; being two lots, containing about 9000 acres of land, of one of which lots the 164 acres in question are a portion. The deed was made upon the consideration of natural love and affection, and of one dollar; and in my judgment, is to be considered, notwithstanding the recital of the consideration of one dollar, under all the circumstances, as a deed executed upon a *good*, as contradistinguished from a *valuable* consideration. The question is whether this deed is rendered void by the adverse possession of Murray and Palmer, at the time of its execution? The doctrine that every deed is void executed by a person against whom the premises attempted to be conveyed are held adversely, has been so long established and recognized, that it is often received and adopted without reference to the grounds upon which it rests. As a general principle, none is more universally admitted. Nevertheless it is not an elementary principle of the common law, nor in terms has it been declared by statute previous to the revision of 1830, which was subsequent to the execution of the deed in question, and therefore cannot, otherwise than as a legislative construction, have any bearing upon the present case. The doctrine was a necessary consequence of the act against champerty and maintenance, 1 *R. L.* 173, § 8; the 8th section of which declares that no person shall buy or sell, or by any ways or means procure any pretended right or title, or make or take any promise, grant or covenant to have any right or title of any person to any lands, tenements or hereditaments, unless such person who shall so bargain, sell, &c. or his ancestors or those by whom he claims the same, thall have been in possession of the same, or of the reversion or remainder thereof, or taking the rents and profits thereof for the space of one whole year next before the said bargain, sale, &c. upon pain, &c. (then follow the penalties imposed for violation of the act, and a proviso having no bearing upon the present question.) The principle of law being well settled that all acts prohibited by law are void, the necessary consequence is that the grants prohibited by this act are void. This is the true foundation upon which has been built the doctrine that adverse possession renders void and inoperative a deed by any person claiming title—a doctrine hitherto regarded not less beneficial than well established. I shall first enquire whether the

grant by John Livingston to the appellant is obviously within the prohibition of the 8th section of the act ? It was the making or taking of a grant, if not literally buying and selling, it was by some ways or means procuring a pretended right or title to have the right and title of the grantor. Upon the face of the statute itself is found no exception, (applied to the 8th section,) in favor of the circumstances of relationship, and settlement or advance, which it is contended take this case out of the statute. Nevertheless, it is undeniable that courts of law have adjudicated as well in relation to the eighth section as to other provisions of the act to prevent and punish champerty and maintenance in such a manner as to defeat its operation upon many cases included in the letter of the act. These adjudications commenced at so early a period, and have been acquiesced in so long, and so often repeated, and withal are so benign in their effects, that although they are objectionable, as invading the legislative power, none but the worst consequences could follow an attempt to enforce by judicial decision the rigorous letter of the statute ; but on the other hand, care is to be taken, lest in applying analogous principles established, to provisions of the act yet unimpaired by judicial construction, we virtually repeal a statute whose general policy stands in a great degree unquestioned, and upon the preservation of which the security of estates so greatly depends. The case of *Thalhimer* v. *Brinckerhoff,* in this court, 3 *Cowen,* 624, was relied upon by the counsel for the appellant, to maintain the position that a deed from father to son, during the continuance of an adverse possession, is not within the *mala prohibita* of the act. As to this case it is to be observed, that the question now before the court was in no wise involved in it ; that the decision of the court was upon a question growing out of a different section of the act, and did not even remotely relate to a question of the *alienation of land* held adversely. And however correct the views of the learned chancellor who delivered the opinion of the court may be considered as to the point decided in that case, the general principles advanced by way of argument cannot be admitted here, unless they prove, on examination, to be amply sustained by authority. Now I apprehend, that as between tenants holding adversely and the grantee under a deed executed by a

ALBANY,
Dec. 1832.

Livingston
v.
Peru Iron Co.

person pretending or claiming title, it has never been held that the relationship of the grantor and grantee, or the *good*, instead of *valuable* consideration of the grant, exempted the deed from the operation of the statute. I am free to admit that the cases are numerous which show that the rigid features of the statute have been relaxed as to the conviction for the penalty imposed by the 8th section, and I will not undertake to defend, upon principle and sound reason, the anomaly that a deed may be void because made in violation of the statute, and yet the parties to the deed be held altogether acquitted of the crime which is constituted by the violation of the statute. Yet such is the principle which has, if I mistake not, obtained, and has prevailed so long that it would be manifestly unsafe, for the sake of harmonizing the decisions, to extend the principle, as is contended for in this case. The *scienter* is a necessary ingredient in the crime of a violation of this statute, and yet the question of *scienter* never was raised in an action between a party claiming under the deed and the person holding adversely. In the case of *Wickham* v. *Conklin*, 8 *Johns. R.* 226, which was a *qui tam* action under the statute, the court distinctly recognize the principle that adverse possession will operate to defeat a deed, although the making or taking the deed does not subject the party to the penalty of the statute. The same principle seems to be conceded in the case of *Lane* v. *Shears*, 1 *Wendell*, 433. While it is freely conceded that the relationship of the parties in a deed may excuse them from the penalties of the act, it is also most obvious that without exception the law has been received and settled in numerous cases, so far as I can find, without the intervention of a single conflicting decision, that adverse possession renders inoperative every grant of the premises except a release: so the law is laid down in *Kent's Com. vol.* 4, *p.* 438, and I agree with the illustrious author, that the legislature in incorporating the same provision in the revised statutes, have only enacted what was universally understood to be the law from the revision. 1 *R. S* 739, § 147. To reverse principles of law thus solemnly and so long settled would be most unwise, and upon a full view of that ground I am clearly of opinion that were it necessary to adopt one or other alternative, the court ought rath-

ALBANY,
Dec. 1832.

er to restore the strictness of the statute as to the infliction of the penalty for champerty and maintenance, than for the purpose of harmonizing the consequences of the act, to abolish the doctrine that adverse possession renders void every deed executed by a party claiming title to the premises. But the revised statutes have removed all this difficulty for the future, by abolishing the penalty, but establishing the effect of adverse possession.

The conclusion of this view of the subject is, that the deed from John Livingston to the appellant was void and inoperative, and consequently that the demurrer is in this respect well taken ; for which reason I am of opinion that the decree of the chancellor be affirmed.

On the question being put, *Shall this decree be reversed ?* the members of the court voted as follows :

*In the affirmative*—The CHIEF JUSTICE, Justice SUTHERLAND, Justice NELSON and Senators BIRDSALL, CROPSEY, LANSING, McDONALD, MATHER, McLEAN and TALLMADGE—10.

*In the negative*—Senators ALLEN, CONKLIN, DEITZ, DODGE, GERE, HUBBARD, LYNDE, SEWARD—8.

Whereupon the decree of the Chancellor was *reversed.*