DENNIS McMAHON, Assignee of Charles T. Harrison, *v.*
THOMAS E. ALLEN.

A conveyance of property gives to the grantee or assignee the right to file a bill,
to set aside a previous invalid conveyance of the same by the grantor.

H. made a conveyance to A. of all the lands, tenements, money claims and
demands belonging to him, as devisee, legatee, or heir-at-law of his mother.
This conveyance was obtained by fraud, and in violation of a fiduciary rela-
tionship existing between H. and A.  H. afterward made a general assign-
ment to M. of all his property, for the benefit of his creditors. *Held,* that
M. could file a bill in his own name, to set aside the previous conveyance
by H. to A., on the ground that the same was inequitably and fraudulently
obtained.

*Held, also,* that receiving money by A. for H., on sales of real estate, and col-
lecting rents by A., as agent for H., and his acting as agent of the executor
of the mother's estate, who was also trustee of personal property to be invested
for the benefit of H., created a fiduciary relationship between A. and H.

THIS was an action to set aside an assignment to the defend-
ant, as having been obtained in violation of a fiduciary rela-
tionship.    The facts are stated at length in the opinion of the
court.

*D. McMahon,* in person.

*Albert Matthews,* for the respondent.

HUNT, J.   On the 22d of March, 1852, Charles T. Harri-
son was the owner of a life estate in No. 694 Houston street,
New York, as tenant in common with his brother, Samuel.
At the same time the defendant was indebted to the said
Charles in the sum of $500, for moneys received by him
belonging to said Charles, from the surplus of the sales of No.
14 Charles street, and for rents of said premises in Houston and
Charles streets, collected by defendant while assuming to act
as agent for the said Charles.   The said Charles also had
an interest in certain trusts under his mother's will, which,
under some circumstances, might be of value.   He was, at
this time, a mariner, had been such for seven years previously,
was reckless, improvident, unacquainted with business affairs

as transacted on land, easily led and persuaded to do foolish things, was needy and in want. At and before the time mentioned, the defendant stood in a fiduciary relation to said Charles, from having acted as his agent in collecting the rents and surplus interest as above mentioned, and had also been the agent of the executor of his mother's estate, who also was trustee of personal property, directed to be invested for the benefit of Charles and his brother Samuel.

On the day mentioned, the defendant, by unjust and inequitable means, obtained from the said Charles a conveyance of all the lands, tenements, claims, demands, bonds and money belonging to him as devisee, legatee or appointee of his mother, or as one of her heirs-at-law, describing, particularly, certain interests and certain lands. Charles was then ignorant of business, and of the value and situation of his property, unacquainted with the state of accounts between him and the defendant, unable himself to investigate them, and had no counsel to advise or assist him. The defendant knew all these facts, knew him to be reckless, improvident and dissipated, did not disclose to him the state of his affairs, but concealed them, and drew him into making the above conveyance, the consideration of which was grossly inadequate, and the defendant's conduct in obtaining the same was inequitable and fraudulent. The actual value of the estate so conveyed was, at least, $2,300, and, under some contingencies, it would have been more valuable. The amount paid by the defendant to said Charles was about $1,100, of which $700 was in money, $150 in a gold watch, and $250 was paid to the defendant's counsel, for which the said Charles received no benefit whatever. At the time of the said conveyance, Charles was indebted to the amount of $600, and his creditors were prejudiced by the conveyance aforesaid.

On the 3d of August, 1852, the said Charles T. Harrison made an assignment to the plaintiff, for the benefit of creditors, of all his property and rights of action, with full power to sue for and collect the same.

On the 3d of September, 1852, the defendant, by further fraud and imposition, obtained from the said Charles a writ-

ing, attempting to revoke the above assignment to the plaintiff.

The facts stated are as found by the referee in his report, and there is evidence to sustain them. They are not interfered with by the Supreme Court, in the judgment given by it, and are obligatory upon us. We are not at liberty to weigh the evidence, to determine whether we should have reached the same conclusion. (Code, § 272.)

Upon these facts, the referee directed the setting aside of the conveyance to the defendant, of the date of March 22, 1852; that an accounting be had by said defendant of the moneys, rents and interests received by him; and judgment was entered upon his report in favor of the plaintiff, with costs. The defendant appealed from this judgment to the General Term of the first district, where the judgment of the referee was reversed, on the sole ground, as stated in the opinion, that the cause of action could not be transferred by Harrison, so that an action could be maintained upon it in the name of the plaintiff.

A transfer of property, real and personal, is obtained fraudulently and inequitably, by false misrepresentations made by the transferee to the transferror, by abuse of a fiduciary relationship, by practice upon a reckless and improvident sailor. The transferror makes a subsequent conveyance of all his property and causes of action to the plaintiff, for the benefit of his creditors. Can the plaintiff maintain an action in his own name against the first transferree, to set aside the conveyance to him, as having been fraudulently and inequitably obtained, and by an abuse of a fiduciary relationship?

In the recent case of *Dickinson* v. *Burrell*, this precise question was presented. (See "The Law Reports," Equity series, 1866, Part III, March 1, p. 337.) James Dickinson and others made a conveyance of their respective shares of the real estate of George Whitehead, deceased, to John Edens, which was liable to be set aside on certain equitable grounds, viz., that Edens was acting as solicitor for Dickinson in relation to the Whitehead estate; that the consideration was inadequate; that Dickinson was in indigent circum-

stances, and ignorant of the value of the property conveyed. Dickinson subsequently made a voluntary settlement of the same property, in trust for himself for life, with remainder to his children, as he should appoint, and, in default of appointment, to all his children who should attain twenty-one years of age, or, being daughters, should marry, in equal shares. The bill was filed by five of Mr. Dickinson's infant children, to set aside the conveyance to Edens as to their portion of the estate. The other three children, the trustees of the settlement, and Edens, were the defendants in the suit. Mr. Dickinson was not a party; Edens demurred to the bill, for want of equity. Mr. Selwyn, Q. C., Mr. Jessel, Q. C., and Mr. Hemings, in support of the demurrer, claimed that the plaintiff could not institute the suit, arguing that, at the time of making the voluntary settlement, Mr. Dickinson had parted with all his interest in the property for a valuable consideration, and that the settlements, therefore, conveyed nothing but the right of suit to set aside the previous conveyance, which was contrary to public policy, on the ground of champerty, and not to be supported in equity. They further argued that, if a *bona fide* conveyance would authorize the suit, it was otherwise with a voluntary settlement, which the settlor could at any time avoid, by a subsequent conveyance for value. Mr. Southgate, Q. C., and Mr. Webb, in support of the bill, argued that there was no case in equity prohibiting the assignment of property, which the assignor was entitled to recover by suit; that the right of suit was incidental to the right of property, and did not affect the right to assign it. The demurrer was overruled, with costs. Lord Romilly, M. R., in deciding the case, said : " Upon the allegations contained in the bill, I am of the opinion that a case is made out, upon which, if proved as there stated, this court would give relief at the instance of the proper persons. The only question, therefore, that I have to determine is, whether, by reason of the deed of April, 1864, the plaintiffs have a right to ask for that relief, when their father, the settlor, and the trustees of the settlement, have refused or declined to concur in asking for such relief." He proceeds :

" Assuming the deed of April, 1864, to have been executed for value, then the right of suing is incidental to the conveyance of the property, and passes with it; that is, if James Dickinson had thought fit, after the sale to Edens in 1860, to sell the same same property to A. B., saying that the previous sale was a fraudulent one, and though he himself could not take any steps to set it aside, if A. B. thought fit to do so he might, and that he would sell all his interest in the property to A. B. for a sum of money, then *bona fide* agreed upon; in such a case, in my opinion, A. B. could have maintained this suit.   The distinction is this: If Dickinson had sold or conveyed the right to set aside the indenture of December, 1860, without conveying his interest in the property, which is the subject of that indenture, that would not have enabled the grantee, A. B., to maintain this bill; but if A. B. had bought the whole interest of James Dickinson in the property, then it would.   The right of suit is incidental to the property conveyed; nor is it, in my opinion, a right which is only incidental to the property when conveyed as a whole, but it is incidental to each interest carved out of it."   He then considers the point that the conveyance was voluntary, and whether that fact alters or affects this right to sue, and says: " I am of the opinion that it does not. * * * Assuming a voluntary deed to be complete, *bona fide* and valid, and unaffected by any statutory disability, I know of no distinction between such a deed and one executed for valuable consideration.   The estates and limitations created in such a deed have the same operation and effect as in a deed executed for value, and must be construed in the same manner, and it carries with it all the same incidents and rights attached to the property conveyed, as are carried by a deed executed for value, and the grantee in this respect stands in exactly the same situation as if he had fair value for the property conveyed."   This was a well-considered case, is of high authority, and in my opinion is an accurate exposition of the law.   I think it should control the present case.

*The Oneida Bank* v. *The Ontario Bank* (21 N. Y., 490, 498), and *Tracy* v. *Talmage* (14 id., 192), were cases similar

in principle to the present. In the former case, the Ontario Bank had issued certain post-dated drafts, which were held to be void within the prohibition of the statute against bills or notes not payable on demand. Assuming such drafts to be void, it was held that the party who received them upon a loan of money to the bank was entitled to the money advanced by him, either upon the basis of a contract of loan, treating that as valid, and rejecting the illegal security, or upon a disaffirmance of the contract, as for money had and received. It was further held, that the discount of such drafts by the Oneida Bank for Perry, the original lender, and the transfer of the same by him to the Oneida Bank, the plaintiff, gave to such transferee the same rights of action against the Ontario Bank that Perry had. The court say: "He who sells a security, and receives his pay for it, necessarily sells whatever claim or right the security is understood by the parties to represent."

In *Tracy* v. *Talmage*, the Morris Canal and Banking Company had received certain post notes, which were held to be void. The Morris Company transferred $196,000 of such notes to the State of Indiana. The consideration for the post notes was certain State stocks delivered to the banking association issuing the same; and the question, among others, was, whether the State of Indiana was entitled to recover that consideration, the notes being considered void. There was no pretense that anything except the notes had been transferred in form; but it was held, that the State was, in equity, the assignee of the demand which the notes professed to represent, and was entitled to recover the value of the stocks. (21 N. Y., 499.)

In *Waldron* v. *Willard* (17 N. Y., 466), the firm of Bourn & Co. executed to the plaintiff a writing, that "we have this day sold to M. N. Waldron all our interest in the goods sunk by the boat Wyoming," with certain other particulars. It appeared that, in the April preceding, Bourn & Co. had shipped the goods in question by the defendant's boats on the Hudson river; that the boat was sunk, and, after being fifty-five days under the water, it was raised, the goods on board were taken out, and sold for the benefit of the line. These

facts were known to both the parties to the bill of sale. It was held by this court, that the above sale operated as a valid assignment of the right of action against the carrier for the non-delivery of the goods.

The case of *Prosser* v. *Edmonds* (1 Younge & Col., 481), is cited as an authority in opposition to the doctrine I have stated. I do not understand the question at issue to have been involved in that case, or that it was intended to have been decided by Lord ABINGER. He says, that where a party assigns his whole estate, and afterward makes an assignment of the same estate generally to another person, and the second assignee claims to set aside the first assignment as fraudulent and void, the assignor making no complaint of fraud, the right of the second assignee to make such a claim would be a question deserving of great consideration. He expresses his "present impression" as against the right, and illustrates his idea by suppositions which are at variance with the principle established in the cases in our courts cited above. In commenting upon this case, Lord ROMILLY says, in *Dickinson* v. *Burrell* (*supra*), " that the case before us does not fall within the rule established by that decision" of *Prosser* v. *Edmonds*.

Nor is this case, in principle, like that of *Nicoll* v. *The New York and Erie Railroad Company* (2 Kern., 121). The decision there was, that where land was conveyed with a condition subsequent, a mere failure to perform the condition does not divest the title, but there must be an entry, or what is equivalent by statute, by the grantor or his heirs, and that the right of entry did not pass by a conveyance of the land. This was upon the express ground that the conditions subsequent were reserved for the benefit of the grantor and his heirs solely, and that no other person could take advantage of the breach. Of a similar character are the usury cases sometimes cited, which hold that the defense is a personal one, and that none but the borrower, technically, or his personal representatives, can set up the defense.

In regard to an adverse holding by the defendant at the time of the execution of the assignment, the case of *Dickinson* v. *Burrell*, as well as that of *Livingston* v. *The Peru*

*Iron Company* (9 Wend., 511), show that such defense is not available, where the holding was under a deed fraudulently obtained. In the latter case, it appeared that Livingston made a voluntary conveyance to his sons, of a large tract of land in Clinton county. His sons filed a bill against the defendants, alleging that their purchase was obtained by fraudulent misrepresentations as to the character and value of the land. The defendants demurred, on the ground that they were in possession of the land, at the time of the conveyance by Livingston to his sons, by virtue of the deed under which they claimed. The Court of Errors held against the demurrer, deciding that possession under a deed fraudulently obtained could not be deemed adverse, so as to avoid the deed to the plaintiff.

The court below, in my opinion, was in error, in holding that the assignment to the plaintiff did not authorize the suit to be brought by him in his own name.

The evidence of abuse of the confidence arising from a fiduciary relation, brought the case within the principle of *Tate* v. *Williamson* (1 Law Reports, Equity series, p. 528), which was, shortly, this : A nephew of a former trustee of B.'s property, being commissioned by his uncle to advise B., a young man aged twenty-three, of intemperate and extravagant habits, in the settlement of his college debts, which amounted to £1,000, and to advance him £500 for the purpose, offered to give him £7,000 for his undivided moiety of an estate, under which there were coal mines, the working of which had been discontinued for fifteen years. Pending the negotiations, A. obtained from C., a mining engineer, an estimate, putting the value of the minerals under the entire estate at £20,000. A separate solicitor was employed for B., at A.'s suggestion, and before completing the bargain, A. urged B. to consult his father (with whom he was not upon very good terms). A. did not communicate to B. the valuation of the engineer, nor did he suggest to him to consult a mineral engineer. B. accepted A.'s offer of £7,000, and died shortly after executing the conveyance. On bill by B.'s administrator, to set aside the purchase : *Held*, that such a fiduciary relation

existed, that the suppression from B. of the engineer's valuation rendered it impossible for the court to sustain A.'s purchase. Sir W. Pᴀɢᴇ Wᴏᴏᴅ, V. C., says: "The broad principle on which the court acts in cases of this description is, that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person, in whom confidence or trust is reposed, to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation, of every particular, resting in the breast of the one, who seeks to establish a contract with the person so trusting him. * * * The young man having then said that he was determined to dispose of his property, it was absolutely impossible for Robert Williamson, filling, as he did, that position of confidential adviser, to enter into any treaty for the purchase of that estate, without communicating to him every particle of information that he himself possessed with respect to its value."*

The judgment of the General Term should be reversed, and that of the referee affirmed with costs.

Judgment accordingly.

* Nᴏᴛᴇ. — The case of *Tate* v. *Williamson* was affirmed, on appeal to the Lord Chancellor, on the 17th day of December, 1866 — not yet reported.

Reporter.