### LEWIS v. UPTON et al.

(Supreme Court, Appellate Division, Fourth Department. May 29, 1900.)

1. ACTION TO DETERMINE TITLE—RECORD TITLE—ADVERSE POSSESSION—VERDICT.

In an action to compel the determination of a claim of title to lands made by defendants, where the court instructed the jury that plaintiff was entitled to recover, if they found in his favor, either on his claim of record title or of title by adverse possession, and the record does not show that the jury found for plaintiff on both grounds, the verdict cannot stand unless the evidence is such as would justify the verdict no matter on which ground it is based.

2. BOUNDARIES—MONUMENTS AND DISTANCES—CHANGING WATER COURSES.

Where it appeared that the boundaries of a lot set forth by metes and bounds were indicated on a map made in 1803 as having somewhat close proximity to a pond of water and certain water courses, and that almost a century thereafter, though such metes and bounds substantially harmonized with monuments described therein, the location of such pond and water courses were further away from the lot, and wholly at variance with the map of 1803, the boundaries of the lot will be controlled by the metes and bounds and monuments therein referred to, and not by the aspect of such pond and water courses.

3. VERDICT—GROUND SUPPORTING—CONFLICTING EVIDENCE.

In an action to compel the determination of a claim of title to lands made by defendants, where the court instructed the jury that plaintiff was entitled to recover if they found in his favor either on his claim of record title or of title by adverse possession, and the record does not show that the jury found for plaintiff on either or both grounds, it cannot be said that they found for plaintiff on the ground of title by adverse possession, where the defendants controverted that claim, and the evidence relating thereto was conflicting.

Williams, J., dissenting.

Appeal from trial term, Monroe county.

Action by John T. Lewis against Eli M. Upton and others to determine a claim of title to lands. From a judgment in favor of plaintiff, defendants appeal. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Charles J. Bissell and Erwin E. Shutt, for appellants.
John Van Voorhis, for respondent.

LAUGHLIN, J. This is an action under section 1638 of the Code of Civil Procedure to compel the determination of the claim of title made by the defendants to the premises described in the complaint. The answer denies plaintiff's title and possession, and sets up title and possession in defendants. Plaintiff replied, averring that defendants' record title is void under the champerty act, and setting up adverse possession as against defendants. The jury rendered a general verdict in favor of plaintiff. There was a former trial with like result, but the trial court granted a new trial pursuant to the provisions of section 1646 of the Code, which authorizes such course, not as a matter of right, but in the discretion of the court and in the interest of justice. The reason assigned for granting a new trial was the failure of defendants' counsel to request the submission of special questions to the jury, and the omission of the court to require the jury to make special findings by which it might be known whether they found in favor of plaintiff on the ground that he had good record title or on the ground that he had acquired title by adverse possession. On the new trial, however, neither counsel requested the submission of such special questions, and the court gave no directions therefor. The court instructed the jury that plaintiff was entitled to recover if they found in his favor either on his claim of record title or of title by adverse possession. Defendants, by a motion for a nonsuit and for a direction of a verdict, by exceptions to the charge and requests to charge, and by a motion for a new trial, specifically challenged the right of the plaintiff to recover upon either of such grounds. Inasmuch as the record does not show that the jury found in favor of the plaintiff upon both grounds, the verdict cannot stand unless he presented a case which fairly required the submission of each of these questions to the jury, and justifies the verdict no matter on which ground it is based. The premises are in township No. 2, short range of townships, in the town of Greece, Monroe county. In 1804 this township was owned by 16 tenants in common, who, by deed dated October 4th, that year, partitioned the same according to a map and survey thereof made for them by William Shepard in 1803, which was annexed to the deed. This township borders on Lake Ontario, and is bounded easterly by the Genesee river. The general course of the shore line of the lake, so far as here involved, is northwesterly and southeasterly. The plaintiff's claim of record title depends on whether the premises in question are included in subdivision lot No. 45. It is claimed by defendants that said premises are in subdivision lot No. 43. The trial court deemed this a question of fact, and left it to the jury. Defendants' counsel contended that, as matter of law, the premises were in lot 43, and excepted to the submission of the question to the jury. These are

adjoining lots, and both abut on the lake; lot 45 being northwesterly of lot 43. By the partition deed, lot 45 was allotted to Sir William Poultney, and lot 43 to Oliver Phelps. Other lots in different parts of the township were allotted to each of them. The plan which the surveyor endeavored to execute, as shown by his map and by notes indorsed thereon, was to make 40 lots of 4 acres each at the mouth of the river, 30 lots of 100 acres each next westerly and southwesterly, and 62 lots of 300 acres each of the remainder of the township. The 300-acre lots are designated the "First Division," and lots 43 and 45 are in that series. Five large ponds, each covering a few hundred acres, are shown at intervals along the shore, and they are bordered by extensive marshes. It appears that it was intended to give to each lot the acreage specified, exclusive of the ponds and marshes which are included within the boundaries of the lots. One of these ponds, known as "Long Pond," is located on lot 45; and another, known as "Buck Pond," is located on lot 43. That part of the premises described in the complaint which lies northwesterly of the Shepard boundary line, hereinafter described, concededly, by the evidence, although not by the pleadings, belongs to the plaintiff. The only controversy is over the premises to the southeast of that line, which consist of 26.4 acres, being a narrow strip of the sandy beach about half a mile in length and 400 feet in width, extending southeasterly along the lake, and between it and Buck pond marsh. The question as to plaintiff's record title to said 26.4 acres depends upon the correct location of the boundary line between these lots. It was evidently the intention to run the boundary lines between the lots into which the township was divided north and south and east and west, respectively, except where this plan was departed from on account of the irregular shore of the lake and margin of the river. The Shepard map and the notes of his survey indicate the boundary line between lots 43 and 45 as running east, in a direct continuation of the boundary line between lots 42 and 45, for the distance of 30 chains, on a course south $87\frac{1}{2}$ degrees east; thence north, 63 degrees east, nearly parallel with, and some distance northwesterly from, the border of the blue coloring on the map indicating an old pond which is now known as "Buck Pond," continuing on this course 82 chains to the shore of the lake. A monument, the genuineness of which is not disputed, and is established by the testimony of the plaintiff's father, to whom it was pointed out by Tennyson, the former owner, is found at the angle made by this boundary line. An experienced surveyor, called by the defendants, says—and in this regard his testimony is not controverted—that the needle of the compass now varies from Shepard's time four degrees and forty minutes. This boundary line, with such modification for such variation of the needle, leaves the premises in question in lot 43. The line run literally according to Shepard's notes, without such modification, would intersect the lake 200 or 300 feet further northwest than with the modification, and consequently would also leave the premises in lot 43. The line as run with such modification is to-day at all points a long distance, and at some places nearly half a mile, northwesterly of the open waters of Buck pond, the intervening lands being swampy and marshy; but it follows quite closely the convoluted margin of

Buck pond marsh to a point within about 400 feet of the lake, where said marsh line diverges, and runs southeasterly, nearly parallel with the shore, for more than half a mile. For nearly the entire distance the boundary line as thus located leaves the margin of the marsh in lot 45, just over the line. Shepard's notes were not introduced in evidence, and are not before us in full. We have extracts from them, given in the testimony of the surveyors, and copied upon the maps. It may be that these notes would show that this boundary from the monument at the angle to the lake, although indicated on the map and by the course and distance as a straight line, was designed to follow the margin of the marsh or pond. That appears to have been the understanding of Shepard's survey by the surveyor who subsequently subdivided the lot, and by the owners in subsequently conveying the same as will be seen presently. In 1817, Valentine Brouthers, a surveyor employed by the Poultney estate, made a subdivision map of the entire township, and a survey of lot 45. Many of the subsequent conveyances are based on this map and survey, and contain express reference thereto. A map found with the title papers of the Poultney estate, purporting to be the original map made by Brouthers, and shown to have been regarded as such for upward of 30 years, the genuineness of which is, however, questioned by the plaintiff, was introduced in evidence. This boundary line is indicated on that map as making an angle, and then running straight to the lake, about as delineated on Shepard's map, but by yellow coloring it shows the northwesterly margin of Buck pond or of Buck pond marsh near the boundary, and generally in lot 45, in which respect it differs from the Shepard map, unless the blue coloring on the latter represents the water and the yellow coloring on the former the marsh line. The original notes of Brouthers' survey were received in evidence. It appears therefrom that he subdivided the entire lot into five parcels. One of these, which he says contains 123.91 acres of "very fine land," in the northeasterly corner of the lot, he describes as follows:

"Lot 45. That part lying between Long and Buck pond, bounded by the outlet east and by an imaginary line from the angle at Buck pond west, beginning at the angle at Buck pond, and running thence with the imaginary line northeast 2 degrees, 27 chains and 25 links, to Long pond marsh; thence along said marsh to the margin of the outlet of Long pond; thence along said margin the different courses thereof to high-water mark of Lake Ontario; thence along Lake Ontario southeasterly to the most southeasterly corner of the lot on the beach of the lake; thence across the beach of the lake southwest 65 degrees, 5 chains 75 links, to the margin of Buck pond; thence along Buck pond the different courses thereof to the beginning. Contents, 123.91 acres."

His notes, as printed in the record, repeat the description of this parcel, with the following slight variation in the course across the beach: "Thence across the beach of the lake southwest 63 degrees, 5 chains, 75 links, to the margin of Buck pond." This part of lot 45 was conveyed by the Poultney estate to John Tennyson, January 7, 1831. The description in this deed follows literally that of the 123.91 acres given by Brouthers, with the exception that it adopts the course from the lake across the beach to the margin of Buck pond given in the repetition in the record before us, viz. "southwest 63 degrees." We find at the end of the description in the deed the fol-

lowing clause: "Containing 123.91 acres, as surveyed by Valentine Brouthers, be the same more or less." Tennyson remained the owner and continued in possession of this farm until his death, intestate, in 1861. He was the father of plaintiff's mother, and, on June 19, 1861, she acquired the interest of his other heirs by deeds containing the same description as that by which her father acquired title. On her death, intestate, about 20 years ago, the title descended to plaintiff, subject to his father's tenancy by the curtesy, which plaintiff acquired by deed on the 21st of August, 1890. A tracing of the map annexed to the deed to Tennyson was introduced in evidence, but, inasmuch as it fails to indicate the boundary line at the lake, it does not materially aid us. This map and that made by Shepard, and also the Brouthers map, show the outlet of Long pond to be in lot 45, but they show no outlet of Buck pond except into Long pond some distance to the south and east and beyond the line of lot 43. It was fairly established upon the trial, however, that for a period of nearly 20 years prior to 1863 there existed an open outlet from Buck pond into the lake at the southeasterly line of the premises involved in this litigation, and since that time this outlet has closed from natural causes, and another outlet has been formed to the southeast. The location of the old outlet is still plainly discernible, and the open waters of Buck pond approach within from 400 to 450 feet of the waters of the lake at this point, which is considerably nearer than at any point to the northwest; but the margin of Buck pond marsh is practically as near the lake at all points to the northwest as at the old outlet, being about 400 feet therefrom at all such points. It is claimed on the part of the plaintiff that this old outlet was in existence when Brouthers made his survey, and that it is the outlet referred to in his notes as forming the easterly boundary of lot 45. The outlet of Long pond ran, and still runs, in such a course as to form to some extent an easterly boundary of the adjacent lands. We think the reasonable construction of said notes, taken in connection with the deed to Tennyson, which refers to no outlet on the southeast, is that the outlet of Long pond was intended. Our confidence in this conclusion is strengthened by the description in the complaint and in the deeds under which plaintiff claims title by adverse possession. The complaint alleges that the premises are "bounded southerly by the outlet of Buck pond as it existed in 1863." In the deed of the premises in question from Shelly to Nash, dated January 5, 1863, and from Nash to plaintiff's father, dated November 20, 1863, and from the latter to plaintiff, dated March 13, 1891, the outlet of Long pond is specified as an easterly boundary, and the old outlet of Buck pond as a southerly boundary. The court also left it to the jury to determine whether the premises in question are included in the Tennyson deed, and whether or not the reference in that deed to lot 45 is to the Shepard lot 45. The defendant's counsel duly excepted to such submission of these questions and to the court's refusal to charge that such reference is to lot 45 as established and described by Shepard. The boundary along the lake given by Brouthers runs to the "most southeasterly corner of the lot," and he does not locate this corner

either on his map or in his notes. The lot being the same number, and having been originally acquired by Tennyson's grantors under Shepard's survey, and being the only premises owned by them in that vicinity, it is manifest that lot 45 as laid out by Shepard, and the corner of the lot as fixed and located by him, were intended. The evidence is undisputed that a line run on the course given in the Tennyson deed across the beach towards Buck pond from the southeasterly corner of the lot as located according to Shepard's survey will intersect the edge of the marsh of Buck pond at the distance of about 5 chains and 75 links; that being the length of the course as given by Brouthers and in the deed. It will also be observed that the direction of the boundary line given by Brouthers and in the deed is the same as given by Shepard,—south, 63 degrees west, being the reverse course of north, 63 degrees east. There was evidence tending to show that the level of the water in the lake and ponds varies a few feet according to whether it is a dry or wet season, and that the ponds are at times higher than the level of the water in the lake, owing to temporary obstructions to the flow of the water through the outlets, and that from time to time the location of these outlets is changed. It would seem that at the time Brouthers made his survey the outlet of Long pond had moved southeast sufficiently to leave 5.05 acres of lot 45 to the northwest thereof. It must have changed back again, for the witnesses say it has been gradually moving to the southeast, and it appears to be now located very near where it was in 1817, according to Brouthers' survey and map. The surveyors called by the plaintiff located this disputed boundary line at the old outlet of Buck pond, but in doing so they leave entirely out of consideration Shepard's map and the notes of his survey. They take Brouthers' survey and the deed to Tennyson as a basis, and say that the measurement at the present time across the beach from the southeasterly corner of the lot to the waters of Buck pond corresponds approximately with the distance given for that course by Brouthers and in the deed to Tennyson. The measurement on this line, as they make it, exceeds that given by Brouthers $20\frac{1}{2}$ feet, and, according to the testimony of the surveyor called by defendants, $70\frac{1}{2}$ feet. The surveyors who locate the boundary at the old outlet then assume that there is no angle in the boundary line, and in so doing disregard Shepard's and Brouthers' notes and maps, which show an angle; and also the reference to an angular point in the deed to Tennyson. They state no other facts on which to base the assumption. They continue the south line of the lot, without an angle, southerly across the marsh and pond, and find that it passes through the pond close to this old outlet, and reaches the shore of the lake at a point 1,500 or 2,000 feet beyond. The Tennyson farm, as located by following the course and measurement of the boundary line as given by Shepard, modified as aforesaid, contains about the number acres, suitable for cultivation, originally specified, and about 10 acres of marsh and sandy land; but, if located as contended for by plaintiff, it will include $255\frac{1}{2}$ additional acres of marsh and pond, including many additional acres of tillable land. Shep-

ard's survey gives the length of the boundary of lot 45 upon the lake as 28 chains and 25 links. It was shown that by following Shepard's traverse of the lake shore from the most southeasterly point of lot 44 on the lake along lots 44 and 43, allowing for the variation of the needle, the measurements given by Shepard locate the southeasterly corner of lot 45 about 60 feet further southeast than this corner is located by running the boundary on the course given by Shepard, similarly modified, from said undisputed monument. Likewise following the Shepard traverse of the shore from the northwesterly corner of lot 55 along lots 55 and 45, his measurements locate this corner 20 feet southeast from where it is thus located from the monument. While these measurements do not verify the absolute accuracy of said boundary line as thus located, they are cogent arguments that the true line is in that vicinity, and not half or three-quarters of a mile to the southeast thereof. In order to locate the southeasterly corner of lot 45 at the old outlet, the course of the boundary line as given by Shepard must be altered $29\frac{1}{2}$ degrees, its measurement must be extended many hundred feet, and the measurement of 28 chains and 25 links given by Shepard as the extent of the boundary of lot 45 upon the lake must be enlarged to about 65 chains. The words "to the margin of Buck pond" in Brouthers' survey and in the deed to Tennyson would be readily susceptible of the construction that they mean the edge of the marsh, were it not for the fact that in other parts of the description the surveyor uses the word "marsh" where he intends "margin"; and the same is true of the language of the deed. In some instances, however, he gives lines running to a pond or to a marsh, and in others to the margin of a pond or of a marsh. We think no such uniform rule is apparent in the use and application of these words as to control their interpretation. It will be seen from Surveyor Brouthers' notes and the quotation we have made from the Tennyson deed that, after crossing the beach on the boundary 5 chains and 75 links "to the margin of Buck pond," by following the margin referred to, whether pond or marsh, the place of beginning at the angular point of the pond, where the monument is located, should be reached. It is a significant fact bearing on the construction of the surveyor's notes and this clause of the deed that this monument is in the marsh, and near the edge or margin thereof, and nearly half a mile from the open waters of the pond. It cannot, therefore, be reached by following the margin of the water, but is readily found by following the margin of the marsh. The margin of the water, as shown on Shepard's map, is, as has been stated, a considerable distance from the disputed boundary line, leaving, as stated by the surveyor, about 70 acres of what appears as white space on the map between it and said boundary line. According to the Shepard and Brouthers' maps, the margin of the coloring, indicating either the water or marsh of Buck pond, is apparently about as near the shore of the lake where the boundary line would cross according to the claims of one party as the other. The construction of Brouthers' survey and of the Tennyson deed, as contended for by the defendants, is sustainable upon the theory that at

that time this marsh was covered with water, so that the course given from the lake, 5 chains and 75 links, would then reach the margin of the water of Buck pond, or that the margin of the marsh, which the measurement on the boundary line as contended for by defendants now reaches, was intended. It is evident that a survey during a wet year or the wet season of the year would show the water in this pond much nearer the margin of the marsh and lake than if made in a dry year or dry season of the year. ·

We are of the opinion that the lot referred to in the Tennyson deed is lot 45 according to Shepard's survey, and that the "most southeasterly corner of the lot" to which the boundary along the lake runs is the southeasterly corner of said lot as fixed and located by Shepard. Such corner is not at the old outlet of Buck pond, but a considerable distance to the northwest thereof, and probably leaves little, if any, of the said 26.4 acres in lot 45. On the evidence before us this boundary line cannot be precisely located as matter of law; but in locating it the Shepard line should be accepted as the true line, and Brouthers' survey and the deed to Tennyson should be construed as referring to lot 45 as laid out by Shepard, and as limited and confined by the boundary thereof, and not as establishing a new lot or new lot line. It was error not to so instruct the jury, for on the question as to whether· plaintiff had record title this was an important, if not a controlling, consideration.

The defendant Hubbell claims title as the heir of said Phelps, to whom lot 43 was awarded by the partition deed. The other defendants claim title by deeds from the heirs of said Phelps, acquired in 1889, and subsequently thereto, and after a projected railroad along the beach rendered these premises available and valuable for summer residences. The jury having found against all of the defendants, the questions of law raised with reference to the validity, under the champerty act, of these deeds from the Phelps heirs, which depended on the facts, seems to be eliminated from this appeal, it being apparent that the verdict was based upon some other ground; otherwise, no recovery could have been had, under the instructions of the court, against the defendant Hubbell, who was unaffected by these questions.

The evidence relating to plaintiff's claim of title by adverse possession, being controverted, cannot be invoked to sustain his recovery. Such title depended upon questions of fact to be found from conflicting evidence, and therefore presented questions for the jury. Inasmuch as the errors pointed out require a reversal, and render a new trial necessary, upon which the facts relating to the other issues may be changed, we refrain from considering the evidence on questions raised relating to those issues.

The order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except WILLIAMS, J., who dissents.