(90 App. Div. 453.)

### LEWIS v. UPTON et al.

(Supreme Court, Appellate Division, Fourth Department. January 26, 1904.)

1. NEW TRIALS—LAW OF CASE—SECOND APPEAL.

Where the Appellate Division held, on reversing a judgment for plaintiff, that the question of adverse possession was one for the jury, and in a subsequent trial the jury found for plaintiff on substantially the same evidence, the Appellate Division, on appeal from the judgment rendered on such verdict, should adhere to its former decision, and affirm the judgment.

McLennan, P. J., and Stover, J., dissenting.

Appeal from Special Term, Monroe County.

Action by John T. Lewis against Eli M. Upton and others. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Charles J. Bissell, for appellants.
John Van Voorhis, for respondent.

WILLIAMS, J. The judgment and order should be affirmed, with costs.

The action was brought under section 1638 of the Code of Civil Procedure, to compel the determination of a claim to real property. The plaintiff claimed he had a record title to the real property, and that he had also acquired title thereto by adverse possession. Upon a former trial of the action both these questions were submitted to the jury under the instruction of the court that the plaintiff could recover if it was found that he had either a record title or a title acquired by adverse possession. The jury rendered a general verdict for the plaintiff. Upon appeal to this court it was held that there was no evidence to support the verdict if it was based upon the claim of a record title, because the deed under which he claimed did not cover the property in question. The court also held that the question of title acquired by adverse possession was one of fact for the jury. 52 App. Div. 617, 65 N. Y. Supp. 263. Inasmuch as the court could not say upon which claim the jury based its verdict, it was compelled to reverse the judgment and direct a new trial upon the question of adverse possession alone. Thereupon the case was again tried, and the decision of

this court followed. The question of a record title was eliminated from the case, and the question of title by adverse possession was submitted to the jury. The plaintiff again had a verdict. Upon an appeal to this court, it is now claimed there was no question for the jury upon this issue, and that the trial court should have held, as matter of law, that the plaintiff acquired no title to the property by adverse possession. This court having once passed upon that question on practically the same class of evidence, we should adhere to our former decision, and leave the question to be considered by the Court of Appeals, should the defendants desire to take the case to that court. If this court had held upon the former appeal that there was no question for the jury as to adverse possession, the case could then have gone directly to the Court of Appeals; but, under the decision then made, a new trial became necessary, and it was had, at considerable expense to the parties, and the result of such trial should not now be nullified by reversing our former decision. Moreover, upon the merits we are of the opinion that the various questions involved in the claim of title by adverse possession, including the occupation and cultivation of the property, and the protecting of the same by substantial inclosure, were properly submitted to the jury, and the evidence was sufficient to support the verdict rendered. No errors in the admission or rejection of evidence or in the charge of the court were committed, calling for a reversal of the judgment.

The judgment and order should therefore be affirmed, with costs. All concur, except McLENNAN, P. J., who dissents in an opinion in which STOVER, J., concurs.

The action was commenced on the 19th day of March, 1895, under section 1638 of the Code of Civil Procedure, to compel the determination of the claim of title made by the defendants to the premises described in the complaint. The answer denied plaintiff's title and possession, and alleged title and possession in the defendants. Plaintiff replied, averring that defendants' title is void under the champerty act, and setting up adverse possession as against the defendants. As appears by the judgment appealed from, three specific questions were submitted to the jury, as follows: First. Was the plaintiff, or were those whose estate he has, in possession of the real property in lot 43, in dispute in this action, for one year before March 19, 1895, the date of the commencement of this action, claiming said premises in fee? Second. At the time of the commencement of this action, had the plaintiff acquired title in fee to the premises in dispute by adverse possession thereof for 20 years or upwards? Third. Are the deeds from the heirs of Oliver Phelps, under which the defendants, except the defendant Hubbell, claim title to the premises in dispute, champertous and void for that reason? The jury answered each of said questions in the affirmative, and thereupon a judgment was entered in favor of the plaintiff, "that the defendants, and every person claiming under them by title accruing after the filing of the notice of the pendency of this action, be, and are hereby, forever barred from all claim to any estate, claim, or interest of any kind or nature in the lands described in the complaint, or any lien thereon or easement therein." The judgment then contained a description of the lands, which is precisely the same as contained in the complaint, and further awarded to the plaintiff the sum of $727.38 for his costs of the action. From such judgment, and from the order denying defendants' motion for a new trial, this appeal is taken.

McLENNAN, P. J. (dissenting). The tract of land which is the subject of this controversy contains 26.4 acres, is substantially 400

feet wide, and extends along the shore of Lake Ontario for a distance of nearly half a mile. While somewhat irregular in shape, it may, for all practical purposes, be described as being bounded on the north by Lake Ontario, on the east by the old outlet of Buck Pond, so called, on the south by Buck Pond and the John Tennison farm, so called, and on the west also by said farm. The tract is a part of township No. 2, short range of townships in the town of Greece, Monroe county, N. Y. The township is bounded on the east by the Genesee river, extends westerly for its entire length along the shore of Lake Ontario, and contains over 20,000 acres, besides 5 ponds, each covering a few hundred acres. In 1803 this township was owned by 16 tenants in common—among others, Sir William Poultney and Oliver Phelps. In that year one William Shepard made a map and survey for the owners of said township, dividing it into lots, two of which were numbered 45 and 43, respectively, each containing about 300 acres, exclusive of the area covered by Long Pond, which was located in lot 45, and Buck Pond, located in lot 43. These two lots, which are the only ones directly involved in this controversy, abut upon the lake and adjoin each other; lot 43 lying immediately easterly of lot 45. By deed dated October 4, 1804, to which the Shepard map and survey were annexed, and made a part thereof, the owners partitioned the township among themselves. Lot 45 was allotted to Sir William Poultney, and lot 43, together with lot 44 and other lots lying still further to the east, all being of substantially the same size, was allotted to Oliver Phelps. In 1817 one Valentine Brouthers made a map and survey of lot 45, dividing it into separate parcels and making a description of each. By deed dated January 7, 1831, which was duly recorded on the 22d day of September, 1832, the Poultney estate conveyed to one John Tennison one of said parcels, being a farm lying in the easterly part of lot 45, which was described by metes and bounds, "containing one hundred twenty-three and ninety-one one-hundredths acres, as surveyed by Valentine Brouthers, be the same more or less." On the 1st day of April, 1847, John Tennison, by an instrument in writing, leased the farm to Delos Lewis, who is the father of the plaintiff, and was the husband of Ann Lewis, deceased, a daughter of John Tennison, now deceased. Delos Lewis continued to occupy the premises from that time as such tenant, residing thereon with his wife until the death of John Tennison, which occurred about the year 1860. By deed dated January 19, 1861, which was duly recorded January 21, 1861, in which the premises are described precisely the same as in the deed from the Poultney estate to John Tennison, the other heirs of John Tennison, deceased, conveyed the Tennison farm to Ann Lewis, plaintiff's mother, and the wife of Delos Lewis. Under such deed she, with her husband, occupied said farm until the year 1881, when she (Ann Lewis) died intestate, and her husband, Delos Lewis, became tenant by the curtesy, with remainder to the plaintiff, John T. Lewis, her only heir and next of kin. By quitclaim deed dated the 21st day of August, 1890, which was duly recorded, Delos Lewis conveyed his life estate in the farm or premises described in the Tennison deed to the plaintiff, John T. Lewis, and he thereupon became vested with the whole title to said premises, and continued to own and was in posses-

sion of the same at the time of the commencement of this action. As we have seen, lot 43, which was immediately east of lot 45, and other lots lying east of lot 43, were allotted to Oliver Phelps by the partition deed referred to, which is the common source of title of all the parties to this action. It must be conceded that by the allotment under such partition deed, and by mesne conveyances, which it is unnecessary to enumerate, the defendants acquired the record title to the premises in dispute, if such premises were located in, and were a part of, lot 43.

The theory of the action, when brought, was that the plaintiff was the owner in fee of the lands in dispute, because they were part of lot 45, and covered by the deed from the Poultney estate to John Tennison, and by the mesne conveyances to the plaintiff. In the complaint, after alleging "that the plaintiff is the owner and seised in fee and is in possession of the following described real property," and then describing such property by metes and bounds, it is further alleged "that the plaintiff has been in possession of said real property for upwards of one year next preceding the commencement of this action as sole tenant, claiming it in fee, and that he holds the same as heir at law of Ann Lewis, deceased, and as purchaser by deed from Delos W. Lewis, and was in possession at the commencement of this action; that the defendants unjustly claim an estate or interest in the said property, claiming to have obtained the same by purchase from the heirs of Oliver Phelps, deceased, and claiming to be the owners in fee of said property." To such complaint the defendants made answer, denying that the plaintiff was the owner of or had been in the possession of the premises for a year previous to the commencement of the action, and alleged that they (the defendants) were the owners in fee simple of the premises in dispute. Thereupon the plaintiff served a reply in which he alleged, in substance, and so far as it is important to note, that he had acquired title to the premises "under a claim of title exclusive of any other right, founding the same upon written instruments as being conveyances of the premises in question, and there has been continued occupation and possession of the premises for more than twenty years under the same claim, before the commencement of this action." And it was further alleged, in effect, that such being the title, possession, and claim of the plaintiff, the conveyances to the defendant were champertous, and therefore void.

Upon the pleadings as thus framed, and upon the opening of plaintiff's counsel, the defendants made a motion at the commencement of the trial to compel the plaintiff "to elect upon which title he will stand— whether as heir at law of Ann Lewis, as alleged in the complaint, or as purchaser by deed from Delos W. Lewis of Shelly title, on the ground that the two titles are absolutely inconsistent and hostile to each other." The motion was denied upon the ground, as we must assume, that by the pleadings or opening it did not appear that the written instruments referred to in the reply or opening were any other than the deed from the Poultney estate to John Tennison, and the mesne conveyances of the Tennison farm to the plaintiff. Of course, it would not do for a plaintiff to claim in the same action that he had acquired title to premises by adverse possession, under a claim of title founded upon a certain written instrument, and at the same time as-

sert that he had acquired such title by virtue of a claim of title founded upon another and different instrument, in no manner connected with the first. The provision of section 369 of the Code is:

"Where the occupant or those under whom he claims entered into possession of the premises under claim of title exclusive of any other right, founding the claim upon a written instrument as being a conveyance of the premises in question."

We think it cannot be held that a person may acquire title to premises by adverse possession, under a claim of title founded upon several instruments in writing, where such instruments are not in any manner connected, or made by the same grantor. In other words, that a claim of title cannot be founded upon all of such instruments, unless they all relate to or originate in the same source of title. Whatever ambiguity there may have been as to plaintiff's claim under the pleadings, it is made entirely apparent by the evidence given by him, or in his behalf, upon the trial.

The plaintiff, upon the trial, endeavored to prove: First. That he was the owner of the premises in question by virtue of the Tennison deed and the mesne conveyances to him. In other words, that the premises in question were a part of lot 45, and were included in and covered by such deed. Second. That although the disputed premises were not actually within lot 45, or included in the Tennison deed, he nevertheless became the owner by adverse possession, because he or his grantors were in possession, claiming to own the same under a claim of title founded upon the Tennison deed and the mesne conveyances to him, for a period of more than 20 years before the commencement of this action. Third. That even if the premises in question were not a part of lot 45, were not included in the Tennison deed, and he did not acquire title to the same by adverse possession, under a claim of title based upon the Tennison deed or the mesne conveyances to him, yet he became the owner of such premises by adverse possession under a claim of title founded upon a written instrument, under and by virtue of the Shelly and Nash deeds, so called, the history of which deeds is briefly as follows: As early as 1855, and for some years thereafter, one Jonathan Shelly, who was a fisherman, lived on the shore of Lake Ontario, in a shanty which he had erected some distance east of the old outlet of Buck Pond, and east of the premises in dispute. Some time prior to 1863 Shelly moved onto the disputed premises and erected another shanty, in which he lived. In the year 1863 a man by the name of Eli Nash, who was also a fisherman, and lived in another shanty on the shore of the lake, entered into an agreement with Shelly to purchase his (Shelly's) shanty, and agreed to pay therefor the sum of $25. Nash went to a lawyer to procure a conveyance of the shanty from Shelly to himself, and was advised by such lawyer to have Shelly execute a deed of the entire beach on Lake Ontario between the old outlet of Buck Pond, on the east, and the Tennison premises, on the west, in order to prevent Shelly from building another shanty upon such premises. A deed was prepared accordingly by the attorney, which described the entire premises in dispute. It was executed by Shelly and delivered to Nash, and bears date June 5, 1863. In the same year Delos Lewis, who at the time was lessee of the Ten-

nison farm, purchased the Shelly shanty from Nash for the sum of $50, and Nash executed to Delos Lewis a deed bearing date December 20, 1863, which contained the same description as the deed from Shelly to Nash, and which also purported to convey the entire premises in question. By deed dated March 13, 1891, Delos Lewis assumed to convey the same premises to his son John T. Lewis, the plaintiff in this action: Neither of said deeds were recorded until the 27th day of July, 1891, and not until after, as it is claimed, the plaintiff had acquired title to the premises therein described by adverse possession, under a claim of title founded upon such written instruments. The Shelly and Nash deeds had lain dormant for nearly 30 years, and, so far as the evidence discloses, no one except those immediately connected with the giving of such conveyances knew of their existence. There is not a particle of evidence to indicate that Delos Lewis ever said to any person during that time that he claimed to own the premises under or by virtue of the Nash deed, or that he ever intimated to any one that he had such an instrument. The premises were not assessed to him; he paid no taxes; there was absolutely nothing to indicate during all those years that he had title to the premises by virtue of a written instrument, or that he claimed to have.

At the time of the purchase by Delos Lewis from Nash, a man by the name of Lowden was occupying the Nash cottage, so called, with his consent, which cottage was located near the southwesterly corner of the premises in dispute, and, after obtaining a deed from Nash, Delos Lewis entered into a verbal agreement with Lowden by which he (Lowden) was given permission to occupy the Nash cottage and some portion of the premises for a yearly rental of $10, to be paid in work. Under such agreement Lowden occupied the Nash cottage from 1863 until the year 1893 or 1894, when he was sent to the Monroe County Poorhouse, and the cottage was pulled down by the defendant Beattie, who claimed to own it.

The evidence conclusively establishes that Nash knew when he purchased from Shelly that he (Shelly) had no right, title, or interest in or to the property described in the deed executed by him; that he was simply a squatter upon the premises; had erected his shanty thereon for his own purposes, and to enable him more conveniently to carry on his occupation of fisherman. Also that Nash, who was likewise a fisherman, and had erected for his convenience a cottage or shanty upon the premises, was also a squatter thereon. The evidence also conclusively establishes that when Delos Lewis purchased the Nash cottage, and accepted the deed of the entire premises from him, he fully understood the nature of the possession of both Shelly and Nash, and knew that neither of them had any title to the premises which they assumed to convey.

Delos Lewis, who was called as a witness for the plaintiff, upon his direct examination testified:

"There was a time when Eli Nash or a man by the name of Shelly constructed a cottage of some kind down on the beach—a little fish shanty. He was a hunter and fisher, and made his living in that way. I knew at the time that Shelly conveyed whatever right he had there to Eli Nash. I did not see the papers executed, but I heard of it."

On cross-examination he stated:

"I couldn't say how long I knew Shelly before he sold to Nash, but he was there a few years. Shelley's cottage or dugout was on the beach there. I don't know how long he was there. I can't tell anything about how Shelly first went there. He squatted down there and built up a shanty, and used to fish and hunt there. * * * I suppose Shelly sold his cottage to Nash."

And in answer to the question, "What did you understand Shelly had to give Nash?" the witness answered, "I did not understand he had any."

When the whole evidence bearing upon the question is considered, we think it should be regarded as conclusively established that when Delos Lewis, the plaintiff's immediate grantor, took the deed from Nash, describing the premises in question, he understood that Nash had no title to the same, and also that Shelly, Nash's grantor, was equally destitute of such title. In other words, he knew they were both squatters upon the premises, and only owned, if anything, the shanties which they had respectively constructed for their own use and convenience.

We have thus far indicated the character of plaintiff's record title, so far as it is based upon written instruments, namely, upon the Tennison deed and the mesne conveyances to the plaintiff thereunder, and the Shelly and Nash deeds, and the mesne conveyances to the plaintiff following such deeds.

Upon a former appeal to this court in this action, the evidence being substantially the same as now before us, it was held, as matter of law, that the lands in dispute were not included in, and did not form a part of, lot 45; were not included in or covered by the Tennison deed; and that the plaintiff did not acquire title thereto by such conveyance, or by adverse possession under a claim of title founded thereon. 52 App Div. 617, 65 N. Y. Supp. 263. Following such decision, it was held by the learned trial justice upon this trial "that the Tennison deed describes land wholly within lot 45; * * * that the plaintiff has no record title under the Tennison deed to the land in question. * * * The Tennison deed, inasmuch as it does not convey the premises in dispute, cannot be made the foundation in this action of a title by adverse possession." Therefore the plaintiff's right to recover under or by virtue of the Tennison deed, or the mesne conveyances to the plaintiff thereunder, is eliminated from our consideration, yet the evidence bearing upon that issue is still before us, and if sufficient to indicate that Delos Lewis, plaintiff's immediate grantor, claimed to own the premises in dispute under a claim of title founded upon such deed, rather than upon the Nash deed, it may become important to determine whether or not he can successfully make a like claim of ownership, and found such claim of title upon the Nash deed. But passing that question for the present, does the evidence justify the finding of the jury that the plaintiff acquired title to the premises in dispute by adverse possession? The acquisition of such title is regulated, so far as important to note, by sections 369 to 372, both inclusive, of the Code of Civil Procedure. Such title can only be acquired in one of three ways:

First. "Where the occupant or those under whom he claims entered into possession of the premises, under claim of title, exclusive of any other right;

founding the claim upon a written instrument, as being a conveyance of the premises in question; * * * and there has been a continued occupation and possession of the premises included in the instrument, * * * or some part thereof, for twenty years, under the same claim, the premises so included are deemed to have been held adversely. * * *" Section 369.

Section 370 defines what constitutes adverse possession by a person claiming a title founded upon a written instrument:

"(1) Where it has been usually cultivated or improved. (2) Where it has been protected by a substantial inclosure. (3) Where, although not inclosed, it has been used for the supply of fuel, or of fencing timber, either for the purposes of husbandry, or for the ordinary use of the occupant. Where a known farm or a single lot has been partly improved, the portion of the farm or lot that has been left not cleared, or not inclosed, according to the usual course and custom of the adjoining country, is deemed to have been occupied for the same length of time as the part improved and cultivated."

Section 371 provides:

"Where there has been an actual continued occupation of premises, under a claim of title, exclusive of any other right, but not founded upon a written instrument, or a judgment or decree, the premises so actually occupied, and no others, are deemed to have been held adversely."

Section 372 defines what constitutes adverse possession under section 371, and provides:

"For the purpose of constituting an adverse possession by a person claiming title, not founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in either of the following cases, and no others: (1) Where it has been protected by a substantial inclosure. (2) Where it has been usually cultivated or improved."

It will be seen that where a person enters upon premises, claiming to own the same, and protects them by a substantial inclosure, or where they have been usually cultivated or improved by him continuously for a period of 20 years, it is entirely immaterial whether he has a conveyance of such premises, or whether or not he claimed title, founding the same upon a written instrument. In either case the continued occupation, the substantial inclosure, the "usually cultivated or improved," if continued for 20 years under a claim of ownership, ripens into title. We are therefore to determine whether or not the plaintiff acquired title to the premises under either of those provisions of the statute: First. Were the premises in dispute protected by a substantial inclosure? As we have seen, the northerly boundary of the premises, extending for a distance of nearly half a mile, was the shore of Lake Ontario; irregular in shape, low and sandy, and some portions of it marshy. Buck Pond formed a portion of the southerly boundary, the shore of which was also irregular in shape and marshy. The balance of the premises upon the south, and also upon the west, was bounded by the Tennison farm, and the evidence indicates that the line of such farm was marked by a substantial fence for a period of more than 20 years before the commencement of this action. The easterly boundary of the premises in question was what is called the old outlet of Buck Pond, which extended from Buck Pond northerly to the lake. The real outlet had been changed to some distance east many years before. The evidence, so far as it relates to the question whether or not the premises in dispute were protected by a substantial inclosure, has refer-

ence to what fence there was, during the alleged occupancy of the plaintiff, along this old outlet, and upon the easterly boundary of the premises.

In order to constitute adverse possession under the provision of the statute which requires that the premises claimed should be protected by a "substantial inclosure," "there must be a real and substantial inclosure and actual occupancy, a pedis possessio, which is definite, positive, and notorious, to constitute an adverse possession, when that is the only defense, and is to countervale a legal title." Jackson v. Schoonmaker, 2 Johns. 230. This definition of adverse possession by a substantial inclosure was quoted with approval by Pope v. Hanmer, 74 N. Y. 240. In Jackson v. Schoonmaker, supra, it was held that making a fence by felling trees, lapping each other, was not sufficient; and that case was cited with approval in Archibald v. N. Y. C. & H. R. R. Co., 157 N. Y. 574–582, 52 N. E. 567. See, also, Lane v. Gould, 10 Barb. 254. The whole theory of adverse possession under such a claim would seem to be that the inclosure should be of such a character as would inform the true owner that by it the occupant claimed to be the owner of the premises, claiming to occupy and hold the same adversely to the real owner. We think the evidence in this case wholly fails to establish that the premises in question were protected by a "substantial inclosure" upon the easterly boundary. It is not sufficient that they were thus protected upon three sides, even if we assume that the Tennison farm, Lake Ontario, and the shore of Buck Pond were sufficient for that purpose. It is essential, under the provision of the statute which we are now considering, that the entire premises should be thus protected. Pope v. Hanmer, supra. Witnesses called by the plaintiff state that at some time there was some kind of a fence to the east of the premises in dispute, following along the line of the old outlet of Buck Pond. When or by whom such fence was constructed does not appear, and how long it continued to be a fence for any practical purpose is not indicated by the evidence. It appears that cattle from the Tennison farm passed beyond it to the east, apparently at will; and that the public generally went upon the premises in dispute without reference to such fence, some of them to get sand, others to hold picnic parties on the shore of the lake. It was constructed, so far as the evidence discloses, of logs, refuse thrown up on the bank of the lake, and trees growing upon its course or line. In other words, the evidence clearly demonstrates that it was a temporary structure, during much of the time serving no purpose as a fence; at other times being more useful, by preventing cattle from wandering away from the premises, or stock belonging on the adjacent property from straying upon said premises. We think there is nothing in the evidence which indicates that such fence defines, or was intended to define, the premises which the plaintiff claimed to be holding adversely to the real owners of the same, or that it was such a structure as proclaimed to the true owners and to the world that the occupant was in possession of the premises bounded thereby, claiming to be the owner thereof. If the plaintiff or his grantors had gone into possession of the premises and constructed the fence, claiming that it bounded lands belonging to them, a different question would be presented; but, as we

have seen, the fence, whatever it was, was built long years before, and without any reference to bounding the premises in question. It had no reference to the occupation of the person living in the Nash cottage, any more than to the occupant of the Tennison farm, or of premises lying to the east of the disputed land. It was as serviceable to one as to the other, and in no manner indicated that it described the boundaries of premises claimed to be owned by the occupant of the Nash cottage. Such fence, at most, was a temporary affair, intermittently kept in repair by those whose purposes it served. It did not constitute a "substantial inclosure," and in no manner indicated that the owner or occupant of the Nash cottage claimed title to the premises lying to the west of such fence. We think it was not of such a character as to make it the basis of adverse possession in favor of the plaintiff.

As to the other provision of the statute, that the premises in question must be "usually cultivated or improved," no time need be spent. The premises, as a whole, were not cultivated or improved. Lowden, the tenant of Delos Lewis, plaintiff's immediate grantor, did cultivate some portion of the premises in dispute; but the extent of such cultivation, or the area covered thereby, is in no manner indicated by the evidence. Whether it was five or ten acres does not appear, and we think a judgment of adverse possession of the whole premises cannot be based thereon.

We are thus led to inquire whether the Nash deed, taken under the circumstances disclosed by the evidence, can be made the basis of adverse possession in favor of the plaintiff. We are constrained to hold that the question of the good faith of plaintiff's grantor in taking the deed is of no consequence; that such a deed, no matter how fraudulent in its inception or how defective in its execution, may be made the basis of adverse possession of the premises described therein, if the person occupying a portion thereof claims title thereto, founding his claim upon such deed, provided such occupancy and claim is such as is defined in section 370 of the Code.

In Livingston v. Peru Iron Co., 9 Wend. 511, the contrary rule was adopted, and it was held:

"A deed fraudulently obtained is not available as the foundation of adverse possession so as to avoid a subsequent conveyance. * * * To constitute an adverse possession so as to bar a recovery, or to avoid a deed subsequently executed by the true owner, the party setting up the possession must, in making his entry upon the land, act bona fide. * * * But if the title be an absolute nullity, as a deed obtained by fraud or forgery, it will not serve as the foundation of an adverse possession."

The same rule was held in La Frombois v. Jackson, 8 Cow. 595, 18 Am. Dec. 463, and in other earlier decisions in this state, as well as by the highest courts of many of the sister states. McCamy v. Higdon, 50 Ga. 629; Bowman v. Wettig, 39 Ill. 428; Smith v. Young, 89 Iowa, 338; Den v. Hunt, 20 N. J. Law, 487.

But we think that doctrine was expressly repudiated by the courts of this state in Humbert v. Trinity Church, 24 Wend. 587. One of the headnotes in that case accurately indicates the scope of the decision, and is as follows:

"Neither fraud in obtaining or continuing the possession, or knowledge on the part of the tenant that his claim is unfounded, wrongful, and fraudulent,

will excuse the negligence of the owner in not bringing his action within the prescribed period; nor will his ignorance of the injury, until the statute has attached, excuse him, though such injury was fraudulently concealed by the contrivance of the wrongdoer."

In Society, etc., of Cincinnatus v. Osborne, 2 Alb. Law J. 457, it was held that possession under a void deed, with a claim of title, is sufficient to give effect to the statute.

In Munro v. Merchant, 28 N. Y. 9, it was held that a deed purported to have been made by virtue of a power of attorney which was not proved gives color of title to found an adverse possession under the statute.

In Abrams v. Rhoner, 44 Hun, 507–510, the court said:

"To constitute an adverse possession, it is not necessary that the title or deed under which the claim is made is rightful; the party need not produce and prove the deed under which he claims, and if, when produced, it is defective as a deed, as for want of a seal or otherwise, it will not destroy the effect of the party's possession. Bradstreet v. Clarke, 12 Wend. 602, and cases cited. An illustration of this principle is shown in conveyances by a pretended agent or attorney. If the power to convey did not exist, in fact, or was a forgery, yet it is sufficient to give color to the grantees' claim of title, and stands upon the same footing as a genuine deed, or a deed under a valid power."

In the case of Sands v. Hughes, 53 N. Y. 287, the court said:

"Entry and possession of land under a deed given without right in the grantor is entry under color of title, and the possession is adverse to the rightful owner."

While we do not consider that the question has been definitely determined by the courts of this state, we feel constrained to leave the final determination of it to the Court of Appeals, and in this case to follow what seems to be the weight of authority, and to hold that a deed taken by a grantee who knows that his grantor had no right, title, or interest in or to the premises conveyed may nevertheless be made the basis of adverse possession under a claim of title founded upon such written instrument. But whatever the character of the Nash deed, it concededly being not such as to convey title to the premises, we think it cannot be made available to the plaintiff for the purpose of establishing title to the premises in question by adverse possession, under the circumstances disclosed by the evidence in this case. So far as appears, no one claimed title to the premises, basing such claim upon it, unless the secret claim or intention of Delos Lewis, not in any manner manifested by word or act, worked such result. Certainly no words were spoken indicative of such intention, and, so far as any acts were concerned, the occupation of the premises was quite as consistent with a claim of title under the Tennison deed, or by the occupant of the Tennison farm, as under the Nash deed and the occupation of Lowden as tenant of Delos Lewis. There is no evidence which tends to show that either used the portion of the premises not actually cultivated by Lowden "for a supply of fuel or of fencing timber, either for the purpose of husbandry or for the ordinary use of the occupant"; neither does the evidence indicate that the premises in dispute were "a known farm," within the meaning of section 370, subd. 3, of the Code of Civil Procedure. The premises in dispute were in no sense "a known farm."

They were simply an unoccupied beach on one of the Great Lakes, surrounded, to be sure, to some extent, by natural boundaries, but at all times accessible to the public, except the small portion which was cultivated by Lowden.

There ought to be no dispute about the facts in this case, especially in view of the decision upon the former appeal, which was followed by the learned justice who presided at the trial we are now reviewing, and who held that the plaintiff acquired no title to the premises in question by virtue of the Tennison deed, or under any claim of adverse possession founded thereon. We are therefore confined strictly to the proposition whether or not the plaintiff acquired title to the premises in dispute by adverse possession, either because the same were protected by a "substantial inclosure," or were cultivated or improved, or whether such premises were acquired by adverse possession under a claim of title founded upon the Nash deed, which it is asserted may take the place of such substantial inclosure, or cultivation and improvement. As before indicated, the premises as a whole were not protected by a "substantial inclosure," neither were they "usually cultivated or improved." It is not enough, in order to constitute adverse possession, that a party enter into possession of premises and fence them without any claim of title. De St. Laurent v. Gescheidt, 18 App. Div. 121, 45 N. Y. Supp. 730. There must be something to indicate that the occupant claims to own the premises under a deed which bounds or describes the same. As we have seen, the foundation or basis of the acquisition of lands by adverse possession is that the person claiming such title has entered into the possession of the same in hostility to the right of the owner, and in such manner as to proclaim, not only to the owner, but to the world, that he (such occupant) claims to own the premises. Such possession must be open, notorious, and adverse. Under the statute it may be indicated by a "substantial inclosure," by usual cultivation or improvement, or by deed which describes the premises, the boundaries of which take the place of the inclosure or cultivation; but in either case we think the occupation must be such as in some manner to indicate that the occupant claims to own the premises. In the case of occupancy under an instrument in writing, if the premises are "a known farm," the occupation of a portion will suffice, but this is upon the theory that the boundaries of the "known farm" are known, and the occupation of a part is notice to the owner that possibly his rights are being infringed upon. So, also, where a portion of the premises has been used "for a supply of fuel or of fencing timber, for the purposes of husbandry, or for the ordinary use of the occupant." In either of such cases the nature of the occupancy indicates to the real owner the possible adverse possession of the occupant, and he has opportunity to protect himself, and prevent such adverse possession from ripening into title of his premises in favor of such occupant. It is not the law, however, that a person may enter upon a tract of land under a deed from a mere squatter, whom he knows has no right, title, or interest in or to the premises which he assumes to convey; retain such deed in his possession without disclosing its existence, and without making any claim to the ownership of the premises therein described under it; then install such squatter

in the premises as tenant; doing no other act or thing than would be done if the occupation was simply that of a squatter; in no manner indicating to the true owner that he (the grantee in such deed) claims to own the entire premises; and then assert, after the lapse of 20 years, that he is the owner of the fee of the entire premises described in such deed.   It is incumbent upon the occupant of property, who claims to have acquired title by adverse possession, to show either that the premises were protected by a "substantial inclosure," that they were "usually cultivated or improved," and that during a period of 20 years he claimed to own the premises thus inclosed or thus cultivated or improved; or, if he claims ownership under a claim of title founded upon a written instrument, it is incumbent upon him to show that he claimed ownership by virtue of and under such instrument, and that he claimed it in such manner as would tend to indicate to the true owner the nature of his claim and possession.   Title to the whole of a tract of land not "protected by a substantial inclosure," or "usually cultivated or improved," cannot be acquired by adverse possession by the occupant of a part, unless such premises are of the character described in subdivision 3 of section 370 of the Code, and are used by such occupant in the manner and for the purposes therein indicated.   The lands in dispute were not used for the supply of fuel or fencing timber for the ordinary use of Lowden, and were not "a known farm," within the meaning of the statute.   True, Lowden's cattle, sheep, and horses sometimes pastured upon the portion of the premises not cultivated by him.   So did the cattle from the Tennison farm, and to a much greater extent.   Much evidence was given to the effect that this was so because the owner of the Tennison farm claimed to own the premises in dispute under and by virtue of the Tennison deed and the mesne conveyances.   Lowden occasionally cut and gathered wild grass near the lake shore.   So did the owner of the Tennison farm, claiming the premises in question as a part thereof.   Aside from the part actually cultivated by Lowden, the premises were used indiscriminately by him, by Delos Lewis, and by any other person who desired so to do.   There was nothing to indicate, either by word or act, that any one claimed to own the entire premises under or by virtue of the Nash deed.

We think it should have appeared by some act of the claimant that he intended to occupy the whole of the premises.   Smith v. Sanger, 4 N. Y. 577.

In Wheeler v. Spinola, 54 N. Y. 377, it was held that an entry upon land once a year for more than 20 years, and the cutting and removal of grass therefrom, by a party who had not inclosed or cultivated it, and where it is no part of a known farm or lot occupied by him, is not sufficient to confer a title by adverse possession.

In Miller v. Long Island R. Co., 71 N. Y. 380, it was said:

"When lands are unoccupied, unimproved and uninclosed, it is quite difficult to make out such possession.  It must be done by showing that the lot so occupied as a wood lot of suitable size for an improved farm, and that the owner of the farm habitually for some years cut thereon his firewood, saw logs, and fencing and building timber.  *  *  *  It cannot be the law that one can enter upon uninclosed wood land, and claim to own it, and cut wood thereon once or a number of times, and thus establish a footing that will enable him to maintain an action of trespass."

Price v. Brown, 101 N. Y. 669, 5 N. E. 434, was an action for trespass upon an uninclosed, sandy beach. It was sought to prove paper title to the property. One of the grantors dried grass on the land a number of times, subsequent grantors cut grass upon the beach, and subsequent and still later grantors sold some sand from the beach. The beach was never inclosed, cultivated, or improved, and they never had in any way, so far as appears, the actual possession of the place where the alleged trespass was committed. It was held "that the evidence thus established was not sufficient, even with the paper title, to maintain an action of trespass." Roberts v. Baumgarten, 110 N. Y. 380, 18 N. E. 96.

In an action to establish a right to land in hostility to the record title, it is necessary to show notice to the defendant of facts upon which the claim is founded, or such facts and circumstances as would put a prudent person on guard. We think such notice must be actual, open, and visible occupation, not equivocal, occasional, or for a special or temporary purpose. Holland v. Brown, 140 N. Y. 344, 35 N. E. 577. In other words, we think the cases clearly establish the proposition that where there is no "substantial inclosure" or the lands are not "usually cultivated or improved," and the occupant relies upon a claim of title founded upon a written instrument, he must give some notice of his claim of title by some act, or by the nature and character of his occupancy. He must do something which indicates that he claims to own the premises. He cannot, to all appearances, be a squatter, pure and simple, only occupying as such, and then, by virtue of a secret deed, under which, so far as is disclosed by any word or act, he has never claimed title to the premises, acquire ownership by adverse possession founded upon such deed.

As we have seen, in the case at bar the premises in dispute were not protected by a substantial inclosure. No part which is defined by the evidence was cultivated or improved, and thus there was no indication to the owner that Lowden, who occupied a shanty in one corner of the same, claimed to own the premises through himself or his alleged landlord, Delos Lewis. Neither is there any evidence to indicate that Delos Lewis, plaintiff's grantor, claimed title to the whole premises by virtue of the Nash deed, or that the possession of his tenant, Lowden, covered any more of the premises than was actually cultivated by him.

Upon the whole evidence, we are constrained to hold, as matter of law, that the plaintiff failed to establish that he acquired any title to the premises in question by adverse possession. It is therefore unnecessary to consider any of the other questions raised by this appeal.

It follows that the judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.